HUTTON, Appellee,

v.

MONOGRAMS PLUS, INC., Appellant.

[Cite as *Hutton v. Monograms Plus, Inc.* (1992), 78 Ohio App.3d 176.]

Court of Appeals of Ohio,
Greene County.

No. 91 CA 07.

Decided Jan. 31, 1992.

*Michael K. Murry*, for appellee.

*Walter Reynolds* and *Ronald J. Kozar*, for appellant.

WOLFF, Judge.

Monogram Plus, Inc. ("MPI") appeals from a summary judgment rendered in favor of David D. Hutton. In granting the summary judgment, the trial court determined that, as a matter of law, a satisfaction clause contained in a franchise agreement executed by MPI and Hutton called for Hutton's subjective satisfaction as to what qualified as "suitable financing."

The following facts are largely undisputed.

On August 4, 1989, Hutton and MPI executed a franchise agreement wherein MPI sold a monogramming franchise to Hutton. Hutton purchased the MPI franchise for $25,000. The terms of the agreement specified that MPI granted a nonexclusive ten-year license to Hutton to operate an MPI store. Pursuant to the agreement, Hutton was obligated to market and promote the retail sale of monogrammed items such as T-shirts, fleece wear, and jackets. On August 17, 1989, Hutton and MPI executed an addendum to

the franchise agreement. The addendum supplemented the franchise agreement, providing in part that if Hutton were "unable * * * to obtain financing suitable to him" within ninety days of signing the franchise agreement, he would then be entitled to a refund of the $25,000 franchise fee. Hutton was responsible for the drafting of the addendum.

There were two primary areas of expenditure involved in the funding of the monogramming enterprise: the "start up" costs, and the purchase or lease of a Meistergram 800 XLC computerized monogramming machine. The purchase or lease of the monogramming machine represented a critical component of the required financing because the entire operation revolved around the application of monograms to imprintable items of clothing.

After executing the franchise agreement and addendum, Hutton obtained a $26,000 loan from Star Bank to cover the start-up costs of the business operation. The loan was secured by a mortgage executed by Hutton and his wife Pamela against their residence.

To facilitate the lease or purchase of the monogramming machine, MPI issued a franchise offering circular to Hutton. The circular, which MPI was required to provide under Ohio law, estimated that the total cost of an MPI franchise varied between $32,420 and $36,720, with an additional $9,150 to $31,150 cost for construction. The fee paid by Hutton accounted for $25,000 of the $36,720 total estimated franchise cost. The circular also estimated that the monogramming machine could be leased for $520, excluding taxes, per month for sixty months, or purchased at a cost of $21,000.

After receiving the circular, Hutton spoke with MPI representative Pam Totty, who functioned as a liaison between Dennis Hanley, MPI's financial director, and MPI franchisees. One of Totty's duties in this capacity was to assist MPI franchisees in securing leases for monogramming equipment. On November 20, 1989, Totty notified Hutton that she had secured a sixty-month lease through United Leasing Corporation. The monthly lease payments totalled $751.01, excluding taxes, with a total equipment cost of $45,060.60 over the life of the lease. The lease also required Hutton to make a ten percent down payment on the purchase price, which was listed at $24,751. Since Hutton considered these terms to be substantially less advantageous than the terms offered in the MPI circular, he rejected the financing. He then requested Totty to submit his application to Trinity Leasing despite the fact that she had told him that he did not meet Trinity's minimum leasing qualifications. At Hutton's insistence, Totty submitted his application to Trinity, which subsequently rejected it due to Hutton's inadequate financial position. When Totty notified Hutton that the application had been rejected, she recommended that he pursue other avenues of financing. In order to help

Hutton obtain financing from other sources, Dennis Hanley prepared a financial statement for Hutton which Hutton then submitted with a loan application to Society Bank in December 1989. This application was rejected because of insufficient collateral.

On January 1, 1990, Hutton wrote to Larry Meyer, MPI's president, requesting a refund of the $25,000 franchise fee due to the difficulty he had experienced in securing financing. This request was denied. On March 5, 1990, Hutton filed a three-count complaint against MPI. In the first count, Hutton sought to recover the franchise fee. In the second count, Hutton sought to recover $1,000, representing the cost of an airline ticket he had purchased to attend MPI's mandatory franchise school in Texas, and other expenses incurred in attending the school. In the third count, Hutton sought punitive damages, alleging that MPI's failure to refund $26,000 to him was done in willful and intentional disregard of his financial interest.

MPI counterclaimed on April 9, 1990, alleging, *inter alia*, that Hutton had breached the franchise agreement by failing to perform his obligations pursuant to the franchise agreement. According to MPI, Hutton's breach caused MPI to lose the opportunity to offer Hutton's franchise to others as well as the loss of a weekly royalty fee of six percent of Hutton's gross sales and one percent of the gross revenues payable to MPI as an advertising fee. MPI also sought attorney fees to which it alleged it was entitled under the terms of the franchise agreement.

Hutton moved for summary judgment on June 1, 1990, arguing that the language of the addendum clearly and unambiguously gave him the sole right to determine what financing was suitable to him. He claimed that since he failed to find financing which was in fact suitable to him, he was entitled as a matter of law to the return of the $25,000 franchise fee. In support of his motion, Hutton offered his sworn affidavit as well as the notice of the rejection of his loan application by Society Bank and excerpts from MPI's franchise circular. In rebuttal, MPI offered the affidavits of Pam Totty, Dennis Hanley, and Roger Guertin, the vice-president of Trinity Leasing. MPI also attached a copy of Hutton's response to MPI's interrogatories, which Hutton had filed on June 21, 1991.

There was a dispute over whether Hutton's father-in-law, Charles Allport, was a potential source of financing. Interrogatory No. 9 requested Hutton to:

"Describe in detail the terms and conditions of any financing agreements and/or arrangements, and/or any support agreements and/or arrangements, between yourself and Charles Allport."

Hutton responded that there was no such arrangement between himself and Allport. However, in Paragraph 5 of Dennis Hanley's affidavit, Hanley

averred that Hutton had represented to him that if the $26,000 loan was insufficient, he could obtain whatever additional funds were needed from his father-in-law. Hanley also averred in Paragraph 6 that he had had various conversations with Allport wherein Allport referred to himself as an investor in Hutton's franchise. Hanley swore that Allport's conduct was consistent with Hutton's representations that Allport would supply additional funding for the franchise if necessary.

The trial court entered judgment on August 3, 1991, granting Hutton's motion. Hutton subsequently dismissed, without prejudice, the second and third counts of his complaint.

Key to the trial court's determination was its finding that the language of the addendum was clear and unambiguous. Based on this finding the court concluded that:

"The $25,000 franchise fee was refundable if within 90 days Plaintiff was unable to obtain financing suitable *to him.* [Emphasis *sic.*] Defendants [*sic*] chose to live with the subjective language employed in the agreement and did not specify any steps Plaintiff would have to take in order to satisfy the condition. The language did not require the Plaintiff to accept any available financing, nor did it require the Plaintiff to exhaust all possible options in an effort to obtain financing. As a consequence Defendants [*sic*] must live with the agreement entered. This Court finds that the Plaintiff's efforts to obtain financing were adequate pursuant to the terms of the agreement in that the first available financing method was clearly out of line with the terms suggested by the Defendant company. The second attempt to obtain financing with a firm which often participates in leasing agreements with franchisees of the Defendant rejected Plaintiff's application without consideration because the Plaintiff did not meet the necessary requirements. The third attempt Plaintiff made to obtain financing through a local bank was rejected because Plaintiff did not have enough collateral. Plaintiff is not required to search endlessly when it seems further efforts will meet with similar results."

MPI has appealed, raising a single assignment of error as follows:

"The entry of summary judgment in the plaintiff's favor upon the claim asserted in the 'first branch' of the complaint, and against the defendant upon its counterclaim, was error."

MPI advances two arguments in support of this assignment.

## I. THE ADDENDUM LANGUAGE IS AMBIGUOUS

MPI first argues that the language of the addendum was ambiguous wherein it predicated Hutton's right to a refund upon his ability to secure

financing which was "suitable to him." According to MPI, these words were susceptible to three interpretations. "Suitable to him" could mean that the financing had to be "suitable as determined by Hutton," "suitable *for* Hutton," or "suitable for Hutton's needs." We agree with the trial court's holding that the language of the addendum created no ambiguity. However, this does not dispose of the appeal because a question of interpretation remains.

Contract clauses which make the duty of performance of one of the parties conditional upon his satisfaction are generally referred to as "satisfaction clauses." These clauses have been divided by the courts into two categories, and have been interpreted in accordance with the category. *Mattei v. Hopper* (1958), 51 Cal.2d 119, 121, 330 P.2d 625, 626.

■ Where the satisfaction clause requires satisfaction as to such matters as commercial value or quality, operative fitness, or mechanical utility, dissatisfaction cannot be claimed unreasonably. In these contracts, an objective standard is applied to the satisfaction clause and the test is whether the performance would satisfy a reasonable person. *Id.; Cranetex, Inc. v. Precision Crane & Rigging of Houston, Inc.* (1988), 760 S.W.2d 298, 301–302.

■ If, on the other hand, the satisfaction clause relates to matters involving fancy, personal taste, or judgment, then a subjective standard is applied, and the test is whether the party is actually satisfied. *Id.* Although application of a subjective standard to a satisfaction clause would seem to give the obligor virtually unlimited latitude to avoid his duty of performance, such is not the case. In these situations, courts impose the limitation that the obligor act in good faith. *Mattei, supra,* 51 Cal.2d at 121, 330 P.2d at 626. Thus, under the subjective standard, the promisor can avoid the contract as long as he is genuinely, albeit unreasonably, dissatisfied. Which standard applies in a given transaction is a matter of the actual or constructive intent of the parties, which, in turn, is a function of the express language of the contract, or the subject matter of the contract. *Kadner v. Shields* (1971), 20 Cal.App.3d 251, 262–263, 97 Cal.Rptr. 742, 751–752.

This court has previously held that an objective standard applies to contracts containing satisfaction clauses. *Enterprise Roofing v. Howard Investment* (1957), 105 Ohio App. 502, 505, 6 O.O.2d 232, 233, 152 N.E.2d 807, 810. However, we neither explained why an objective standard applied in that case nor distinguished between those contracts which require a subjective assessment of satisfaction by a court and those which require an objective assessment. This distinction is critical to the disposition of this appeal. Although we did not address this distinction in our holding in *Enterprise Roofing,* we

did not say that an objective standard applies to every satisfaction clause in every contract.

The Hamilton County Court of Appeals has twice recently considered contracts containing satisfaction clauses. In *Superior Die & Eng. v. Gen. Chain & Mfg. Corp.* (Aug. 15, 1984), Hamilton App. No. C–830748, unreported, 1984 WL 6958, the court cited *Enterprise Roofing* and held that "where performance is to be measured by the satisfaction of a party to a contract, the general view has been that an objective standard of reasonableness will apply to assess the sufficiency of performance." *Superior Die* also recognized that an exception existed where the subject matter of the contract involved individual taste, personal convenience, or individual preference. *Id.* at fn. 1. The court reached the same result in *Loft v. Sibcy–Cline Realtors* (Dec. 13, 1989), Hamilton App. No. C–880446, unreported, 1989 WL 149667, relying on *Enterprise Roofing* and *Superior Die.*

In addition to considering these Ohio cases, we find it helpful to examine how other jurisdictions have considered the question of whether to apply an objective or subjective standard in determining whether the trial court applied the correct standard.

As to the appropriate standard, other jurisdictions have categorized satisfaction clauses in the same manner as did *Kadner v. Shields, supra.* For example, a subjective standard governs when the language of the contract expressly calls for the application of such a standard. An example of such language is found in *Ard Dr. Pepper Bottling Co. v. Dr. Pepper Co.* (C.A.5, 1953), 202 F.2d 372.

*Ard* dealt with a satisfaction clause contained in a commercial licensing agreement which granted to Ard the exclusive license to bottle Dr. Pepper soda in a designated territory. The satisfaction clause at issue reserved Dr. Pepper Co.'s right to rescind Ard's license if Ard did not faithfully promote the sale of the Dr. Pepper product to Dr. Pepper Co.'s satisfaction. The satisfaction clause at issue was as follows:

" '(e) To at all times loyally and faithfully promote the sale of and secure thorough distribution of Dr. Pepper throughout every part of said territory and to all dealers therein, and to develop an increase in volume of sales of Dr. Pepper satisfactory to the Grantor. And in this connection, the Grantee agrees, represents and guarantees that the said territory included in this license, and every part thereof, and all dealers therein, ca-, [*sic* ] and will be fully covered, solicited and worked by the Grantee in a systemkatic [*sic* ] and business-like manner now, and at all times hereafter while this license agreement remains in effect.

" 'The determination and judgment of Dr. Pepper Company as to whether or not this clause is being complied with when made in good faith, shall be sole, exclusive and final, and such determination by the Dr. Pepper Company that this clause is not being complied with shall * * * be grounds for forfeiture of this license.   * * *

" ' * * *

" '(k)5.   That in case of the violation of any one or more of the terms or provisions of this license agreement by the Grantee or in the event Grantee fails, within the judgment of the Grantor, to faithfully comply with provisions as above set out, then Grantor shall be entitled to cancel or terminate this license upon giving written notice mailed to Grantee by registered mail and addressed to his last known place of business, and upon notice being given of such cancellation as herein provided, this license agreement and all rights hereunder shall be terminated and at an end, provided, however, that in the event of the termination of this license agreement as herein provided, or in any other manner, such termination shall not release the Grantee from the payment of any amount which may then be owing to Grantor.   And upon any termination of this license agreement Grantee shall discontinue the use of the name of "Dr. Pepper" and the bottling of said product.   The judgment and determination of Dr. Pepper Company when made in good faith, as to the failure of Grantee to comply with any of the terms of this license, shall be, and is hereby, made conclusive and final.   * * *' "   *Id.* at 374–375.

The decision in *Ard* to measure Dr. Pepper Co.'s satisfaction according to a subjective standard rested upon the construction of the contract terms which gave Dr. Pepper Co. the right to revoke Ard's license.   The circuit court, agreeing with the district court's judgment, found that the contract expressly provided that absent bad faith, Dr. Pepper Co.'s judgment on the matter was conclusive.   *Id.* at 376.   The contract expressly made Dr. Pepper Co. the sole arbiter of satisfaction, circumscribed only by the exercise of its good faith judgment.   Thus, the express language of the contract implicated a subjective standard of satisfaction.

In this case, we are not presented with an *Ard*-like situation where the contract language clearly mandated that Hutton's satisfaction be assessed subjectively.   Nowhere in the addendum does it state, as it did in the *Ard* contract, quoted *supra*, that Hutton's judgment as to the suitability of financing was to be "sole, exclusive or final."   Nor did it impose a "good faith" limitation on his judgment.   (Even if Hutton's satisfaction as to the financing were to be assessed subjectively, he was still required to present evidence that he was, in good faith, dissatisfied with the available financing. Since Hutton presented no evidence as to the genuineness of his dissatisfac-

tion, the court should not have, for this additional reason, granted summary judgment in his favor.)

■■■ The addendum contained only a general satisfaction clause. The fact that a contract contains a general satisfaction clause, without more, does not mandate the application of a subjective standard. Absent express contract language, courts have looked to the nature of the contract as an indicator of which standard governs. In these cases, there still is no clear line of demarcation. Generally, the subjective standard applies to contracts involving matters of aesthetic taste, feasibility of operation, or management, regardless of financial impact. The objective standard of the reasonable person is generally applied where commercial or financial matters are involved. *Kadner, supra,* 20 Cal.App.3d at 263, 97 Cal.Rptr. at 752; *Cranetex, Inc. v. Precision Crane & Rigging of Houston, Inc., supra; Mattei v. Hopper, supra.* This is not to say that a subjective standard is always inapplicable to a contract involving commercial transactions. *Mattei v. Hopper, supra.*

*Mattei* involved an action for breach of contract by a purchaser against a vendor who failed to convey real estate in accordance with the terms of a deposit receipt executed by the parties. The real estate was to be developed into a commercial shopping center. The concluding paragraph of the deposit receipt contained a satisfaction clause which conditioned the purchaser's tender of the payment of the balance of the purchase price upon a bank's obtaining leases for the tenants of the shopping center which were satisfactory to the purchaser. The purchaser complied with the preliminary terms of the deposit receipt, but the vendor repudiated the contract while the purchaser was in the process of obtaining the leases. The purchaser secured satisfactory leases and offered payment of the balance due on the contract. The vendor refused to tender the deed. The precise issue in *Mattei* was whether the condition of the purchaser's "satisfaction," which satisfaction the court determined was to be scrutinized on a subjective basis, rendered the agreement illusory and unsupported by consideration, and thus unenforceable against the vendor.

While recognizing that an objective standard generally applied where the condition called for satisfaction as to commercial value or quality, as was the case therein, the California Supreme Court nevertheless applied a subjective standard. The court so concluded because application of an objective standard was impracticable under the facts presented:

" * * * [I]t would seem that the factors involved in determining whether a lease is satisfactory to the lessor are too numerous and varied to permit the application of a reasonable man standard as envisioned by this line of cases.

Illustrative of some of the factors which would have to be considered in this case are the duration of the leases, their provisions for renewal options, if any, their covenants and restrictions, the amounts of the rentals, the financial responsibility of the lessees, and the character of the lessees' businesses.

"This multiplicity of factors which must be considered in evaluating a lease shows that this case more appropriately falls within the second line of authorities dealing with 'satisfaction' clauses, being those involving fancy, taste, or judgment. Where the question is one of judgment, the promisor's determination that he is not satisfied, when made in good faith, has been held to be a defense to an action on the contract." (Citations omitted.) *Id.*, 51 Cal.2d at 123, 330 P.2d at 627.

Such a holding is consistent with the view taken by the Restatement of the Law 2d, Contracts (1981), Section 228, which states:

"When it is a condition of an obligor's duty that he be satisfied with respect to the obligee's performance * * * *and it is practicable to determine whether a reasonable person in the position of the obligor would be satisfied,* an interpretation is preferred under which the condition occurs if such a reasonable person in the position of the obligor would be satisfied." (Emphasis added.)

(The California Supreme Court rejected the vendor's contention that the subjective nature of the purchaser's satisfaction rendered the argument unenforceable.)

In this case, the evidence fails to establish that it would have been impracticable to apply an objective standard to the addendum. Hutton presented no evidence of impracticability. Indeed, he only presented evidence and argument as to the unambiguous nature of the addendum's language, resting his motion on the alleged inherently subjective nature of the language. Therefore, absent evidence of impracticability, we consider whether the nature of the contract indicated which standard controlled. We find *Kadner v. Shields, supra,* to be instructive.

*Kadner* involved a breach of contract action stemming from a dispute over a real estate sale. The buyers had agreed to purchase a luxury tract home in Beverly Hills subject to their satisfaction with the terms and conditions of an encumbrance they were to assume which was contained in an escrow agreement. If they were dissatisfied with the terms of the encumbrance, the escrow agreement stated that they were entitled to the return of their partial down payment. *Id.*, 20 Cal.App.3d at 254, 97 Cal.Rptr. at 745. In reversing the trial court's judgment which held that the buyers' approval had to be measured according to a subjective standard, the court of appeals examined

when satisfaction is measured by an objective standard and by a subjective standard. The court held that:

"Which test is to be used in a given transaction is a matter of actual or constructive (legally presumed) intent of the parties. * * * The choice can be settled of course by explicit language in the instrument. We feel that that is lacking in the instant case. So it is one of constructive intent. The absence of such explicitness in the instant case militates against a judicial decision in favor of the subjective personal judgment criterion in two ways: * * * In the absence of a specific expression in the instrument or a clear indication from the nature of the subject matter, the preference of the law is for the less arbitrary standard of the reasonable man." *Id.*, 20 Cal.App.3d at 262–263, 97 Cal.Rptr. at 751–752.

In this case, the franchise agreement was clearly commercial in nature and pertained to matters of financial concern. Without express language to the contrary, or evidence of impracticability, the commercial nature of the contract, without more, dictated that Hutton's satisfaction had to be measured objectively.

There was nothing unique about this commercial contract that would implicate a subjective assessment of Hutton's satisfaction. Indeed, this contract presents a classic example of an arm's-length business transaction in which reasonable business concerns, relevant to the financing of equipment, dictated the terms of the contract.

Based on the foregoing analysis, we hold that, in the absence of express language to the contrary, or evidence of impracticability of application, an objective standard governs satisfaction clauses in contracts which involve commercial and financial matters. Accordingly, we conclude that the trial court improperly applied a subjective standard in assessing Hutton's satisfaction.

## II. GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER HUTTON WAS "UNABLE" TO LOCATE FINANCING SUITABLE TO HIM.

■ This argument requires us to determine whether the trial court correctly found that there was no genuine issue of material fact as to Hutton's *inability* to locate financing. This poses a discrete query separate from the issue of the *suitability* of available financing. In their briefs, the parties agree that even if the satisfaction clause were assessed according to a subjective standard, a separate "good faith" standard would govern the determination of whether Hutton was *able* to secure financing. The good faith inquiry focuses on whether Hutton exerted a reasonable effort to locate

suitable financing. The following undisputed facts are relevant to this inquiry.

Hutton admitted that he could obtain financing from at least United Leasing. MPI had negotiated the lease terms with United Leasing on Hutton's behalf. Hutton refused to accept the United Leasing proposal in part because the monthly lease cost was almost $200 more than the monthly cost set forth in MPI's franchise circular. Aside from the United Leasing proposal, Hutton explored only two other avenues of financing. He first requested that MPI submit a lease application to Trinity Leasing despite his knowledge that he did not qualify for such financing under Trinity's leasing guidelines. Trinity denied his application. Hutton then submitted an application to Society Bank of Dayton which was prepared with Dennis Hanley's assistance. The application was rejected due to insufficient collateral.

The trial court apparently concluded that these efforts were sufficient to obviate any genuine issue of fact as to whether Hutton was able to locate financing. While we agree with the court's observation that Hutton "[was] not required to search endlessly when it seem[ed] further efforts [would] meet with similar results," we do not agree these efforts conclusively established that Hutton exerted a good faith effort to secure financing. Indeed, we identify two issues of material fact based on this uncontroverted evidence. The issues are whether contacting only one bank and only one other leasing institution constituted a reasonable effort to secure suitable financing, and whether Hutton could claim he made a reasonable attempt to secure suitable leasing with United Leasing and Trinity Leasing when MPI, not Hutton, arranged the United Leasing lease, and when Hutton knew before submitting an application to Trinity that he did not meet Trinity's leasing criteria.

Moreover, the record also contains critical, disputed evidence which precluded summary judgment. The affidavit of MPI's financial director, Dennis Hanley, contained evidence that Hutton told Hanley he could, in fact, have obtained the necessary financing from his father-in-law, Charles Allport. Hanley's affidavit also contained evidence that Allport had repeatedly represented himself to Hanley as one of Hutton's franchise investors. In his response to MPI's interrogatories, Hutton steadfastly denied any such arrangement existed. This conflicting evidence, without more, was sufficient to create a genuine issue of fact as to Hutton's ability to obtain satisfactory financing and to thus render summary judgment inappropriate.

The assignment of error is sustained.

The judgment of the trial court will be reversed. The matter will be remanded for further proceedings consistent with this opinion.

*Judgment accordingly.*

BROGAN, J., concurs.

FAIN, P.J., concurs in the judgment.

FAIN, Presiding Judge, concurring in the judgment.

Although I concur in the judgment of the court, I would apply a subjective standard in determining whether reasonable minds could reach different conclusions as to whether Hutton was unable to obtain financing "suitable to him."

I find Judge Wolff's analysis of this issue to be excellent, but I would reach a different conclusion. There are many variables to consider in determining whether financing is "suitable." Besides the duration of the loan and the interest rate, there are (i) the scope and extent of the definitions of acts of default; (ii) the consequences of acts of default, which can range from modest to punitive; and (iii) the extent of personal collateral required for the loan. In my view, the many and diverse implications of the terms of possible financing packages makes this case similar to *Mattei v. Hopper* (1958), 51 Cal.2d 119, 330 P.2d 625, in which it was held to be impractical to apply an objective test for a contracting party's satisfaction.

Although I would employ a subjective test, I nevertheless agree that reasonable minds could reach different conclusions whether "suitable" financing was available to Hutton. There was some evidence that Hutton had refused MPI's help in seeking possible sources of financing, and there was some evidence, albeit controverted, that Hutton's father-in-law was a possible source of financing. In my view, reasonable minds could have reached different conclusions whether Hutton acted in good faith in declaring that no suitable financing was available to him. Therefore, I join in the judgment of this court reversing the summary judgment rendered in Hutton's favor, and remanding this cause to the trial court for further proceedings.