OPINION
Appellant, JEL Equities Company ("JEL"), was a limited liability company created by Larry Altschul and his two children to buy property known as Centre Plaza at 35550 and 35575 Curtis Blvd., Eastlake, Ohio ("Centre Plaza") in 1989. The property contained two five-story buildings on roughly three acres of land.
In early 1997, appellee, Meridia Health Systems ("Meridia") was searching for property in Lake County to build an ambulatory surgery center, a physicians clinic, and medical office space. It was the job of Mark Horton, the corporate director of facilities and support services for Meridia, to find a suitable property for these buildings. Meridia's original parameters for the property were that it be a vacant five-acre site near State Route 91, between Interstate 90 and State Route 2. They were looking to build a one-story, 20,000 square foot ambulatory surgery center, with an adjoining multi-story office building. Mr. Horton looked at many lots, some vacant and some containing buildings; he found several candidates, including the Centre Plaza.
On April 23, 1997, JEL agreed to sell Centre Plaza to Meridia for $5,000,000. The purchase agreement contained the following clauses:
 "12. Inspection Contingency: Purchaser shall have sixty days to conduct * * * such physical inspections including, but not limited to a structural and environmental audit, including soil conditions, review of zoning and availability of appropriate signage, review of existing and potential leases, and other investigations of the property as may be reasonably required to assure Purchaser that the subject property is suitable for its intended use by Purchaser, and that the property is free of any physical and environmental defects which are unacceptable to the Purchaser. * * *. In the event that Purchaser notifies Seller of its objection to the present conditions * * * this agreement shall be declared null and void. * * *"
 "Board Approval: This offer is subject to approval by the Board of Trustees of Meridia Health System, within 30 days of execution of this agreement."
The agreement was later amended to give Meridia until July 11, 1997 to conduct the inspection and reduced the purchase price by $100,000. In signing the April 23 agreement, Meridia was seeking to "lock in" the land so that they could have some control over it while inspecting it to determine if it met its needs.
After signing the agreement, Meridia hired Owner's Representative Services, Inc. ("OSRI") to conduct a due diligence survey of the building to determine if it was sufficient for Meridia's intended use. OSRI determined that the building had many defects. The optimal building design would have been a 20,000 square foot one story building, but the configuration of Centre Plaza would require it to be spread out over two or more floors. The elevators at Centre Plaza were too small to fit a hospital gurney. There was insufficient parking to fit Meridia's needs and satisfy the Eastlake zoning ordinance. Mr. Horton explored many options to remedy the problems, including expansion of the first floor and purchasing an adjacent three-acre parcel of land for more parking, which Meridia was unable to do. These plans would cost more than $500,000. Mr. Horton attempted to negotiate with Mr. Altschul for him to reduce the purchase price to pay for half of the repairs and to extend the July 11, 1997 deadline for the inspection contingency for them to find further remedies. In their depositions, Mr. Altschul testified that he believed that they had reached an agreement to reduce the purchase price to $4,650,000, but Mr. Horton testified that Mr. Altschul refused both offers. On July 11, 1997, Meridia informed JEL that it was not satisfied with the property and cancelled the contract.
On January 27, 1999, JEL filed a complaint against Meridia, in the Lake County Court of Common Pleas. In its complaint, JEL alleged that Meridia breached a contract to purchase Centre Plaza. On June 21, 1999, Meridia filed a motion for summary judgment in which it argued that the contract contained a contingency that required the Meridia Board of Trustees to approve the agreement within thirty days of its execution, which it did not do, and it had a right to terminate the agreement under the "inspection contingency" clause.
Appellant countered that: Meridia never presented the contract to the Board of Trustees for its approval; Meridia rejected the property for reasons other than its physical condition and, thus, did not act in good faith; Meridia was satisfied with the physical conditions of the property; Meridia waived the "inspection contingency" clause by attempting to negotiate a reduction in the price; and, Meridia should be estopped from asserting physical defects known to them before the execution of the agreement. On September 16, 1999, the trial court sustained appellee's motion for summary judgment.
Appellant raises the following assignments of error:
 "[1.] The trial court erred in granting defendant-appellee's motion for summary judgment because viewing the evidence in a light most favorable to plaintiff-appellant, the non-moving party, reasonable minds could find that the parties entered into a subsequent agreement by which Meridia agreed that the contract contingencies had been satisfied.
 "[2.] The trial court erred in granting defendant-appellee's motion for summary judgment because reasonable minds could find that the property was suitable for its intended use.
 "[3.] The trial court erred in granting defendant-appellee's motion for summary judgment by allowing Meridia to use conditions known prior to the contract as the basis for asserting its dissatisfaction with the contract pursuant to a satisfaction contingency clause.
 "[4.] The trial court erred in granting defendant-appellee's motion for summary judgment because reasonable minds could find that Meridia did not exercise the contingencies in good faith when voiding the contract."
All four of appellant's assignments of error dispute the propriety of the trial court's granting summary judgment. Pursuant to Civ.R. 56(C), a party is entitled to summary judgment if it can demonstrate that there exists no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. See Dresher v. Burt (1996),75 Ohio St.3d 280, 662 N.E.2d 264. Civ.R. 56(E) provides that an adverse party must not rest upon the mere allegations or denials of its pleadings, but its response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. Mitseff v. Wheeler (1988), 38 Ohio St.3d 112, 115,526 N.E.2d 798. Affidavits are not required to overcome a motion for summary judgment. Under Civ.R. 56(C), summary judgment cannot be rendered if, after construing the evidence most strongly in favor of the non-moving party, genuine issues of material fact can be shown through sources, such as, pleadings, depositions, answers to interrogatories, or transcripts of evidence in the pending case.
In its first assignment of error, appellant asserts that factual issues existed about whether Meridia waived all objections to known conditions of the property in exchange for a $250,000 reduction of the purchase price. It argues that, on June 24, 1997, the parties entered into a new agreement to waive the inspection clause as to all then known defects, such as the parking problems, and to reduce the purchase price to $4,650,000.
As evidence of this new agreement, appellant points to a letter sent to Larry Altschul by Meridia's real estate broker, Richard Bialosky. This letter, dated July 11, 1997, states:
 "I have been authorized by Mark Horton, Corporate Director of Facilities for Meridia Health Systems, to notify you under Paragraph 12, Inspection Contingency of the above referenced Agreement, that the properties do not meet the intended use contingency. Therefore, unless a satisfactory option to extend the Inspection Contingency under Paragraph 12 to July 31, 1997, can be mutually agreed upon by 5:00 p.m. Monday July 14, 1997, the Agreement shall be declared null and void; all funds and documents deposited in escrow prior hereto shall be returned to the appropriate party; and each party shall be relieved of further liability, one to the other.
 "As previously stated, Meridia is prepared to pay as consideration to Seller, $1,000 per day above and beyond the $4,650,000 purchase price for the extended period * * *."
Mr. Bialosky's letter does not indicate that Meridia had waived the inspection contingency clause, but that it was exercising it. While evidence existed to show that Meridia proposed that the deadline be extended, the evidence is conflicting as to whether it was ever agreed to. Appellant further presents evidence of two unsigned proposed amendments to the contract. The parties do not agree that they were adopted. The first amendment provided that the purchase price was to be reduced to $4,650,000, but did not mention that the inspection contingency was waived. The second amendment provided that: "The Inspection Contingency Period described in Paragraph 12 shall expire at midnight, Cleveland, Ohio time, July 31, 1997."
At his deposition, Richard Bialosky testified that he believed the parties had agreed to a price reduction because of the amount of work needed to bring the Centre Plaza buildings up to code. Byron S. Krantz, who represented Larry Altschul in the transaction, testified that: "Mr. Bialosky told me on June 25th that the intended use had been met. I drafted an agreement that day consistent with what I was told, that the contingency had been met." Mr. Bialosky testified that the inspection clause was never met and no agreement was made to waive the inspection contingency.
The parol evidence rule does not bar evidence of a subsequent oral agreement which modifies a prior written agreement. Where evidence is offered to prove the existence of an oral agreement which rescinds a prior written contract or any provision thereof, such evidence is not inadmissible by virtue of the parol evidence rule and, if otherwise relevant and competent, must be considered by the trial court in its disposition of the issues before it. Gerwin v. Clark (1977),50 Ohio App.2d 331, 332-333, 363 N.E.2d 602.
However, the testimony of Krantz and Altschul, while admissible, is not competent to show that the inspection clause was waived. Every communication from Meridia, that is in the record, shows that they were exercising their rights under the inspection clause, at all times, while appellant presented evidence that it attempted to persuade Meridia to waive the inspection clause, none of it raises a question of fact that they agreed to such a waiver. Appellant's first assignment of error is without merit.
In its second assignment of error, appellant asserts that a genuine issue of fact existed about whether the property was suitable for Meridia's intended use. Appellant argues that the contract term "its intended use" was ambiguous and must be construed in appellant's favor. It argues that the contract provision should be construed to mean that the Centre Plaza property, which by itself did not meet all of the needs for Meridia, was only meant as part of the project. Appellee counters that whether the property could have been used in conjunction with the adjacent lot is irrelevant because the "inspection contingency" is a satisfaction clause that allowed it to terminate the agreement if it were not satisfied.
At issue is the "inspection contingency" clause, which operates as a "satisfaction clause." Courts have divided "satisfaction clauses" into two categories, subjective and objective. Hutton v. Monograms Plus, Inc.
(1992), 78 Ohio App.3d 176, 181, 604 N.E.2d 200. An objective standard applies where the satisfaction clause requires satisfaction as to such matters as commercial value or quality, operative fitness, or mechanical utility. Under one of these clauses, dissatisfaction cannot be claimed unreasonably and the test is whether the performance would satisfy a reasonable person. Id. A subjective standard is applied where the satisfaction clause relates to matters involving fancy, personal taste, or judgment and the test is whether the party is actually satisfied. Under the subjective standard, the party can avoid the contract as long as he is genuinely, albeit unreasonably, dissatisfied. Id. Although the trial court concluded that an objective standard should be used, we read the language of the "inspection contingency" as requiring us to apply a subjective standard. The clause provides that appellee may inspect the property to determine "that the property is free of any physical and environmental defects which are unacceptable to the purchaser." (Emphasis added.)
Meridia had a right, under the contract, to terminate the agreement if it found a defect unacceptable to it. Even under the objective standard applied by the trial court, no issue of fact was presented to dispute the property was unsuitable for Meridia's intended project. For the property to even come close to those needs, Meridia would have needed to acquire the adjacent property, which it was unable to do. Appellant's second assignment of error is without merit.
In its third assignment of error, appellant asserts that Meridia should be estopped from claiming conditions known to it before entering the contract, such as the deficiency in parking and the unavailability of the adjacent property, as a basis for its dissatisfaction with the property. Specifically, appellant argues that by allowing Meridia to cancel under these circumstances would render the contract illusory. Appellee counters that appellant would be unable to bring an action on an illusory contract and that it was unaware of the defects at the time it entered into the contract.
"[A] contract is illusory only when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and thus makes it merely illusory." Century 21 Am. Landmark, Inc. v. McIntyre (1980),68 Ohio App.2d 126, 129-130, 427 N.E.2d 534. The contract in question is unquestionably one-sided in favor of Meridia. Under its terms, appellants were required to hold open Meridia's option to purchase the land while Meridia could cancel it for any reason. Understood by the parties was that Mark Horton was merely an agent whose initial agreement needed to be approved by Meridia's Board of Trustees. Meridia's Board of Trustees was not required to approve the agreement and had the power to reject it, even if the property exceeded its needs.
Although the "inspection contingency" could be interpreted in such a way that Meridia would have no obligations, rendering it illusory, the evidence shows that Meridia made considerable effort to inspect the physical conditions of the property. Even if the agreement were illusory, on its face, Meridia, nonetheless, conducted extensive investigations as contemplated by the contract. Under the circumstances presented, Meridia acted properly in canceling the contract. Appellant's third assignment of error is without merit.
In its fourth assignment of error, appellant asserts that Meridia breached its duty of good faith and fair dealing, which it claims is an inherently factual determination. Appellant contends that Meridia cancelled the contract for reasons unrelated to its satisfaction with the building, the building was suitable for its intended use, and Meridia misrepresented its real reasons for canceling the contract. The parties dispute whether a duty of good faith and fair dealing is implied in all contracts formed in Ohio. A duty of good faith applies to canceling a contract based on a satisfaction clause in that the canceling party may only do so because of genuine dissatisfaction. Hutton, supra.
In February 1997, the Cleveland Clinic had, in effect, taken over Meridia. Appellant points to a July 23, 1997 letter from Charles Miner, the President and CEO of Meridia, to Floyd Loop, the CEO of the Cleveland Clinic, that stated: "Our ambulatory surgery center and relocated Erieside Clinic are on hold while we determine our strategy with Lake County." From this single sentence, appellant argues that Meridia was merely feigning dissatisfaction with the property as a strategic ploy, in concert with the Cleveland Clinic, to implement its Lake County strategy and negotiate with other hospitals. Appellant also cites a statement made by Mark Horton to Mr. Altschul that "Loop did not want to go forward until the Lake West issue was resolved." Horton testified at his deposition that when he made that statement, he had no factual basis for making it. That evidence is not sufficient to raise an issue of fact that Meridia failed to act in good faith. No other admissible evidence is presented to support appellant's contention. Significant evidence of Meridia's dissatisfaction with the property was presented. Reasonable minds could only conclude that Meridia acted in good faith.
Furthermore, by its terms, the contract required approval by the Board of Trustees, who could reject it for any reason, in good faith or otherwise. Appellants contend that Meridia cannot assert the failure of approval by the Board of Trustees as a reason to void the contract because the contract was never presented to the Board of Trustees. The evidence shows that the contract was not presented to the Board because it was clear that the property was not acceptable and would not have been approved. Appellant's fourth assignment of error is without merit.
Appellant has raised no genuine issue of material fact sufficient to deny appellee's motion for summary judgment. The judgment of the trial court is affirmed.
 ________________________________ NADER, J.
FORD, P.J., O'NEILL, J., concur.