OPINION
{¶ 1} On June 10, 2005, the Ohio Court of Claims entered judgment in favor of plaintiff-appellant cross-appellee, Dr. Timothy Knowles ("Knowles"), on his claim for slander against defendant-appellee/cross-appellant, The Ohio State University ("OSU"), and in favor of OSU on Knowles' claims for breach of contract and libel. Knowles now appeals, seeking reversal of the trial court's judgment insofar as it found in OSU's favor on his contract and libel claims. He also assigns error as to the amount of damages the court awarded on his slander claim. OSU cross-appeals, seeking reversal of the portion of the judgment resolving Knowles' slander claim against it.
 {¶ 2} The following facts are gleaned from the record and are undisputed and unrebutted unless specifically noted. In the spring of 1999, Knowles was employed as Vice President for Students and Campus Support at Meharry Medical College in Nashville, Tennessee. Pursuant to an application Knowles had submitted to OSU the previous fall, Isaac Mowoe ("Mowoe"), an OSU professor of African-American Studies and African Studies, contacted Knowles regarding the vacant position of OSU's Vice Provost for the Office of Minority Affairs ("OMA").
 {¶ 3} The Vice Provost is in charge of all operations of OMA, which include the Frank W. Hale, Jr. Black Cultural Center, minority scholarship services, diversity initiatives, recruitment and retention of minority students, and the Young Scholars Program ("YSP"), which identifies and supports first-generation college-bound minority high school students in Ohio and provides them an opportunity to attend OSU with financial assistance.
 {¶ 4} Mowoe was the chair of the search committee, which had been seeking a permanent Vice Provost of OMA since 1997. Knowles made two separate interview trips to Columbus, after which Dr. Edward Ray ("Ray"), who was then OSU's Vice President and Provost, offered the position to Knowles.
 {¶ 5} By letter dated June 9, 1999, and countersigned by Knowles on June 15, 1999, the parties' agreement provided, in pertinent part:
 This appointment will begin August 1, 1999 and is for a period of five years subject to the results of an annual performance review and continued acceptable performance. You will be eligible for reappointment to a second term subject to a broadbased performance review toward the end of your first term of service. Should I determine that terminating your appointment before the end of the five-year period is appropriate, severance pay of one year's cash salary will be provided.
 {¶ 6} On June 12, 2000, Larry Lewellen ("Lewellen"), OSU's Associate Vice President of Human Resources, sent a memorandum to Ray and to Nancy Rudd ("Rudd"), OSU's Vice Provost of Academic Policy and Human Resources, advising them of reports from OMA staff and others within the university community that Knowles exhibited a coercive and autocratic management style, promoted conflict and failure among his staff, and communicated poorly his vision for the office and his expectations of each staff member as it related to that vision.
 {¶ 7} Ray informed Knowles about these complaints and advised that, at his behest, Lewellen would conduct a further investigation of the matter. Notwithstanding the investigation, by letter dated June 21, 2000, Ray advised, "[i]n order to provide for variation in increases, I have treated a 3.5% raise as a signal of satisfactory performance.With that in mind, I am forwarding a salary increase for you of $5,280, or 4.00% for FY01, which will result in a salary of $137,280 for next year." Ray went on to state:
 I continue to believe that you can be a great success in your position and I genuinely admire your values and your willingness to take on tough issues. I hope that we have both learned some lessons this year and that we can be even more effective partners next year.
 I know that this has been a particularly difficult year in which we have contended with labor disputes, demonstrations, public complaints about administrative salaries and job performance, while striving to make substantive progress on many fronts, including the Academic Plan and the Diversity Plan. Please know how much I have appreciated your patience, hard work and professionalism during this period.
 {¶ 8} Both Ray and Lewellen testified that most of the language in the letter was taken from a form letter that Ray sent to all vice provosts that year. They further testified that Ray needed to approve the salary increase on June 21, 2000, and could not wait until he received the results of Lewellen's investigation, because all salary increase requests had to be submitted no later than June 22, 2000. Both testified that the four percent raise was a "placeholder" to ensure that Knowles would receive that increase if it turned out to be warranted, but that the number could later be reduced. Knowles testified that he considered the June 21, 2000 letter to be his annual review.
 {¶ 9} On July 12, 2000, Lewellen reported to Ray the results of his investigation. The next day, Ray and Lewellen met with Knowles and advised him of the results of the investigation. Ray told Knowles that he was being relieved of his position as of July 31, 2000, and he could choose to resign no later than July 21, 2000, or he would be terminated. Plaintiff did not resign and Ray terminated him on July 31, 2000, with one year's salary as severance pay.
 {¶ 10} On March 27, 2001, Knowles instituted this action in the Court of Claims, asserting breach of contract, defamation and denial of due process. Beginning March 11, 2002, the court held a three-day trial. After Knowles presented his case-in-chief the court dismissed all of his claims pursuant to Civ. R. 41(B)(2). Following the issuance of findings of fact and conclusions of law, Knowles appealed to this court, arguing that the court erred in excluding certain evidence essential to proof of his defamation claims, and that the court erred in dismissing his contract claim. This court agreed with Knowles' position and reversed and remanded for a new trial. See Knowles v. Ohio StateUniv., 10 th Dist. No. 02AP-527, 2002-Ohio-6962 ("Knowles I").
 {¶ 11} On remand, the court held a new trial, following which it issued a decision and judgment in favor of OSU on Knowles' breach of contract claim and his libel-based defamation claim, and in favor of Knowles on his slander-based defamation claim. The court awarded damages to Knowles on the slander claim in the amount of $25,025.
 {¶ 12} Knowles timely appealed and advances the following assignments of error for our review:
 1 The court erred in failing to find that Provost Ray and OSU breached the contract.
 2 The court erred in finding an unreasonably low amount of damages for the slander of Dr. Knowles.
 3. The court erred in not finding the libelous releases and publications to be false.
 {¶ 13} OSU filed a notice of cross-appeal and advances two assignments of error as follows:
 1. The trial court's finding that Dr. Ray made the alleged defamatory statement is against the manifest weight of the evidence.
 2. The trial court's award of damages is without any legal or evidentiary basis.
 {¶ 14} We begin with Knowles' assignments of error. His first assignment of error presents several legal and factual issues related to his claim for breach of contract. First, he argues that the parties' contract required that OSU have "just cause" in order to lawfully terminate him, and that Ray did not have just cause to do so. In the alternative, Knowles argues that even if the contract is an "objective satisfaction" contract, the evidence does not support that Ray's dissatisfaction with Knowles was reasonable or that Ray acted in good faith.
 {¶ 15} The construction of a written contract is a matter of law that we review de novo. Saunders v. Mortensen, 101 Ohio St.3d 86,2004-Ohio-24, 801 N.E.2d 452, ¶ 9; Alexander v. Buckeye Pipe LineCo. (1978), 53 Ohio St.2d 241, 374 N.E.2d 146, paragraph one of the syllabus. A court's primary role when construing a written contract is to ascertain and give effect to the intent of the parties. Saunders, at ¶ 9. The intent of the parties to a contract is presumed to reside in the language employed in the agreement. Ibid.; DiMarco v.Shay, 154 Ohio App.3d 141, 2003-Ohio-4685, 796 N.E.2d 572, ¶ 20. Words will be given their ordinary meaning in a contract unless manifest absurdity results or some other meaning is clearly evident from the face or overall contents of the document. Shifrin v. Forest City Enterprises,Inc. (1992), 64 Ohio St.3d 635, 638, 597 N.E.2d 499; Buckeye PipeLine, at paragraph two of the syllabus. The writing will be read as a whole, and the intent of each party will be discerned from a consideration of the whole. Foster Wheeler Enviresponse, Inc. v.Franklin Cty. Convention Facilities Auth. (1997), 78 Ohio St.3d 353,361, 678 N.E.2d 519.
 {¶ 16} The issue whether Knowles' employment contract was a "just cause" contract or a satisfaction contract was decided in his first appeal, where we determined that the contract is a satisfaction contract. "The employment contract at issue contains a `satisfaction clause,' so that plaintiff's continued employment was contingent on his satisfactory performance in his position as Vice Provost of OMA."Knowles I, ¶ 40. "[T]he decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels."Nolan v. Nolan (1984), 11 Ohio St.3d 1, 3, 11 OBR 1, 462 N.E.2d 410.
 {¶ 17} Indeed, "[c]ontract clauses which make the duty of performance of one of the parties conditional upon his satisfaction are generally referred to as `satisfaction clauses.' " Hutton v. Monograms Plus,Inc. (1992), 78 Ohio App.3d 176, 203, 604 N.E.2d 200. In the present case, the parties' contract contains such a clause, to wit: "subject to the results of an annual performance review and continued acceptable performance[.]" Thus, as we previously held, the parties' contract is a satisfaction contract.
 {¶ 18} Though we determined in Knowles I that the parties' contract is a satisfaction contract, we did not determine whether it is a subjective or objective satisfaction contract. "Courts have divided `satisfaction clauses' into two categories, subjective and objective. Which standard applies in a given transaction is a matter of the actual or constructive intent of the parties, which, in turn, is a function of the express language of the contract, or the subject matter of the contract. " Ibid. (Citations omitted.) See, also, Keeva J. Kekst Architects, Inc. v. George (May 15, 1997), 8th Dist. No. 70835. The language of the contract at issue in this case does not expressly call for evaluation of OSU's satisfaction either subjectively or objectively; it contains merely a general satisfaction clause.
 {¶ 19} "Absent express contract language, courts have looked to the nature of the contract as an indicator of which standard governs. In these cases, there still is no clear line of demarcation. Generally, the subjective standard applies to contracts involving matters of aesthetic taste, feasibility of operation, or management, regardless of financial impact." Id. at 184. The subjective standard is likewise applied when the satisfaction clause relates to matters involving fancy, personal taste, or judgment. Id. at 181. "The objective standard of the reasonable person is generally applied where commercial or financial matters are involved." Id. at 184.
 {¶ 20} Here, the parties' contract relates to Knowles' performance as Vice Provost of OMA. According to Knowles, his duties in that position included managing, directing and overseeing OMA's operations, budget and personnel. This contract required satisfaction as to matters of management, operation and judgment, not matters of commercial value or quality. Thus, we hold that the parties' employment contract is a subjective satisfaction contract.
 {¶ 21} Where a subjective standard is applied to determine whether a party is "satisfied," the test is whether the party is actually satisfied. Id. at 181. "Although application of a subjective standard to a satisfaction clause would seem to give the obligor virtually unlimited latitude to avoid his duty of performance, such is not the case. In these situations, courts impose the limitation that the obligor act in good faith. Thus, under the subjective standard, the promisor can avoid the contract as long as he is genuinely, albeit unreasonably, dissatisfied." Ibid.
 {¶ 22} Accordingly, in the present case, OSU was required to perform only so long as it was subjectively satisfied with Knowles' performance, subject to the requirement that OSU act in good faith. The trial court found that OSU (Ray, in particular) was indeed dissatisfied with Knowles' performance as Vice Provost and that OSU acted in good faith. Resolution of Knowles' first assignment of error depends upon whether the trial court's findings in this regard are supported by competent and credible evidence.
 {¶ 23} It has long been held that judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. The C.E. Morris Co. v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279, 8 O.O.3d 261,376 N.E.2d 578, syllabus. With this standard in mind, we have thoroughly reviewed the record to determine whether it contains competent, credible evidence that Ray was indeed dissatisfied with Knowles' performance and that OSU (through its agents, including Ray) acted in good faith.
 {¶ 24} Knowles testified on his own behalf. He began work under his appointment as Vice Provost on August 1, 1999, but arrived several days earlier in order to attend a function of the YSP, which had recently come under the auspices of OMA. According to Knowles, he was aware prior to the commencement of his employment term that he would be inheriting numerous institutional problems that had plagued OMA in the recent past. Several people who interviewed him told him about problems that existed within OMA, involving budget, personnel and student services. Some of these problems had precipitated a sit-in by a group of African-American students who were protesting the lack of communication between OMA and students, as well as certain proposed organizational changes to OMA. Knowles stated that the interviewers who advised him of OMA's problems specifically inquired how he would handle personnel who were underqualified for their positions.
 {¶ 25} He further testified that Human Resources Consultant Tyrome Alexander ("Alexander") told him, during the first few days of his tenure, that several OMA executive staff members, specifically, Tamra Minor ("Minor"), Maurice Shipley ("Shipley") and Rose Wilson-Hill ("Wilson-Hill"), were overpaid and undermotivated and that Knowles would have difficulty holding them accountable. He testified that Alexander told him he should get rid of all of them and start over. Knowles checked with Rudd, who told him that Minor was not trained in the area in which she was working.
 {¶ 26} Knowles testified that in late October 1999, when he presented Ray with a document outlining his assessment of staffing issues, Ray told Knowles that his assessment was on target and commended Knowles for the completeness of his analysis and his willingness to work closely with the Office of Human Resources. Also in October 1999, the two spoke about and agreed on specific goals for OMA for the coming year.
 {¶ 27} Knowles detailed numerous accomplishments that he achieved during his tenure at OSU, including organizing a "student coordinating council" by mid-October 1999, visiting every office on campus to introduce himself, twice meeting with the Black Faculty Council, meeting with a group of black graduate students, holding a staff retreat in February 2000 at the Faculty Club, completing integration of the formerly separate business and information technology operations of OMA and YSP, establishing a professional staff development program to fund seminars and conferences, meeting with Hispanic, Asian and Native American student organizations, obtaining participation and funding from an increased number of other colleges for OMA's annual Graduate/Professional School Visitation Program, appointing a new business manager, filling the vacant position of development officer, and participating in drafting a report by the faculty senate committee on ways to improve retention and graduation by minorities.
 {¶ 28} Love Ali ("Ali"), who is an OSU alumnus and was a member of the committee that interviewed and ultimately recommended the hiring of Knowles, testified on Knowles's behalf. She testified that Knowles maintained open communication with students and met with them anytime they requested a meeting. She also stated that Knowles formed the student advisory council, which was one of the demands that she and other African-American students, a group called the "African Student Union" ("ASU"), had made during the 1998 sit-in.
 {¶ 29} Ali testified that whenever she would see Ray he would ask whether Knowles was being responsive to students and she would respond in the affirmative, saying that Knowles was doing a good job. Ali further testified that Knowles was kind, receptive, and well mannered at meetings at which she was present. Ali stated that Ray never told her that there were any complaints or concerns with respect to Knowles and that, if there were any concerns, she would have expected Ray to tell her because he had promised, after the sit-in, to communicate with students.
 {¶ 30} However, on cross-examination she admitted she was aware that some students had complained about Knowles. Specifically, she was aware that some were upset at comments Knowles made indicating he thought that black students should not attend OSU and should instead attend only historically black colleges and universities. Ali also admitted she was aware that faculty and staff had complained about Knowles to Dara Cooper, another member of ASU. She also stated that her perception was that Ray liked Knowles. Ali conceded that she was out of the country from the time she graduated in Spring 2000 until July 10, 2000, so she was unaware of any events or complaints that would have occurred during that time period.
 {¶ 31} Kim Walton ("Walton"). also testified on Knowles' behalf. She first met Knowles in 1999, at which time the two discussed Knowles' desire to plan an event celebrating OMA's 30th
anniversary. Walton, who had planned the event at which the two met, holds a bachelor's degree and a master's degree in public administration. Knowles ultimately hired Walton for a contract term beginning January 2000 and ending September 2000, for the purpose of planning the 30th anniversary celebration. During her tenure, Walton interacted with OMA staff and attended executive staff meetings and the February 2000 retreat.
 {¶ 32} Walton testified that his immediate subordinates frequently challenged Knowles and that staff meetings were very tense and sometimes volatile as a result. Despite this, Walton stated, Knowles always used an even tone of voice at meetings, he was very detailed and would break things down to a "child-like level" for his staff. Walton stated that Knowles never raised his voice and clearly stated his vision for the office at every meeting, always asking each staff member what he or she had done lately to further that vision. In Walton's opinion, members of Knowles' staff treated him in an unprofessional manner. She acknowledged on cross-examination that she did not work directly with many of the key members of Knowles' staff, so she could not evaluate their work overall.
 {¶ 33} Laurie Johnson ("Johnson"), also testified for Knowles. At the time of trial she was employed as the Director of Operations at OSU's Department of Pathology, but Knowles hired her in February 2000 as OMA's business manager. Her duties included overseeing all of the basic business operations of OMA, including payroll. She stated that she attended OMA executive staff meetings on a bimonthly basis. She testified that Knowles was always well organized at staff meetings and never yelled at or demeaned anyone. She observed that several executive staff members, specifically, Minor, Wilson-Hill and Shipley, would always resist and challenge Knowles by either not completing something that he had asked them to do, or by disagreeing with him. Johnson stated that Knowles never asked these staff members to do anything that was not part of their jobs. She felt that Knowles was trying to hold his staff accountable.
 {¶ 34} On cross-examination, Johnson admitted that she worked in a different office than the other OMA employees did and thus did not observe their day-to-day work, and she was not present when Knowles gave staff their work assignments.
 {¶ 35} Alexander testified on behalf of OSU. Though in a different position with OSU at the time of trial, Alexander was, during Knowles' tenure at the university, a Human Resources ("HR") Consultant in OSU's Office of Human Resources. As an HR consultant he provided assistance to offices within OSU with respect to employee relations, compensation and training. He was assigned to the office of Student Affairs, the Wexner Center for the Arts and OMA. His assignment to OMA began in late summer of 1998, after the student sit-in had taken place. Alexander played no part in hiring Knowles.
 {¶ 36} On one of Knowles' first several days on campus, Alexander introduced himself to Knowles and offered to assist Knowles with any HR-related issues. Knowles told Alexander that he had already removed Paula Smith ("Smith") as Acting Director of YSP and demoted her to Associate Director. The two met the following week, at which time Knowles told Alexander that he was naming Shipley as the director of YSP. Knowles also told Alexander that he would relieve Wilson-Hill of her duties managing the business affairs of the office and would do them himself, while retaining Wilson-Hill as Special Assistant to the Vice Provost and Director of Special Projects.
 {¶ 37} Alexander testified that he liked Knowles and still does. When he first met Knowles, Alexander thought Knowles was a strategic thinker and that he had a plan as to what he wanted OMA to achieve. As early as August 1999, however, Alexander began to receive complaints about Knowles' communicative style and management decisions.
 {¶ 38} Minor complained that, though her first interaction with Knowles had been positive, he had since begun "backtracking" on things he had promised. Smith filed a complaint against Knowles arising primarily from the way in which he had reassigned her duties, doing so with no advance notice, while she was on vacation. Both Minor and Smith, along with Wilson-Hill, complained early on about Knowles' communication style.
 {¶ 39} After Lewellen began hearing complaints about Knowles, he inquired of Alexander. In response, Alexander sent an email to Lewellen, dated August 19, 1999, in which Alexander explained that he saw "the directors struggling with this (sic) management style, particularly Paula Smith and Rose Wilson-Hill." He went on to say, "[i]t is my impression that Dr. Knowles is trying to rearrange his management structure before school starts." (Defendant's Exh. FFF.) Alexander maintained frequent contact with Knowles, meeting with him once per month, sometimes more often, and speaking with him by telephone on a regular basis.
 {¶ 40} In September 1999, Alexander and Lewellen met with Knowles to discuss concerns regarding Knowles' communications with certain members of the staff. They also told him that his staff was "unaware of what he's doing and why. Staff feel changes are being made without input nor understanding of the current system." They also discussed with him the fact that Minor and Wilson-Hill felt "marginalized." (Defendant's Exh. J.) According to Alexander, Lewellen was very supportive of Knowles at this meeting.
 {¶ 41} Also at this meeting, Knowles informed Alexander and Lewellen that he desired to remove Ellen Banks ("Banks"), from her position as Executive Assistant to the Vice Provost because she lacked the skills required for the position, despite the fact that Banks had been employed in that position for 30 years and, according to Alexander, had an "exemplary" performance record. In a confidential memorandum prepared by Alexander and Lewellen and dated October 15, 1999, Lewellen suggested various options available, given the fact that Banks was a classified civil service employee, and offered his office's assistance in exploring and implementing one or more of those options. However, Knowles ultimately reassigned Banks to an administrative office assistant position and hired a new Executive Assistant.
 {¶ 42} Also in his memorandum to Knowles, Lewellen advised of his opinion that lack of communication with the staff regarding "OMA's current and future mission and vision, intended structure, and values" had "left an impaired staff and management environment." (Defendant's Exh. L.) Lewellen suggested that Knowles conduct quarterly all-staff meetings to provide updates, answer questions and define initiatives, that he work with OSU organizational management consultant Don Chenoweth to gather data on staff issues and organizational functioning, and that he explain to each director what his or her role and responsibility was and how each director's role fit within Knowles's mission. According to Alexander, Knowles rejected the suggestion that he conduct meetings with all of the staff, saying that "no one" has such meetings.
 {¶ 43} On October 17, 1999, Smith lodged a formal, written complaint to Lewellen regarding Knowles. She charged, inter alia, that she had been denied the right to express philosophical differences without fear of retaliation or intimidation and that she had been subjected to a hostile working environment. She alleged that Knowles had made "inappropriate communication to and about" her, that he had been untruthful and misleading, he had violated confidentiality, and had communicated to her in a "humiliating, condescending" fashion. (Defendant's Exh. M.) She stated that Knowles told her he would eliminate the position of Acting Director of YSP, which she held, and would conduct a national search for the permanent position of Director, for which she was encouraged to apply. Ten days later, while she was away from the office on vacation, he appointed Shipley to the permanent position, without conducting a national search, and without informing her that she was not being appointed to the permanent post.
 {¶ 44} On October 26, 1999, Minor wrote an email to Alexander. In it she explained that she and Knowles had agreed that, due to the large workload that both jobs entailed, Minor would no longer work on recruitment and would focus solely on retention issues. Knowles promised not to share this with anyone at OMA until she could speak with her staff about it, but nevertheless discussed the change extensively at a staff meeting before Minor had the opportunity to speak with her staff. He also indicated to members of her staff that she was moving away from recruitment because she no longer wanted to work with them. This caused her staff to be very upset. Minor closed the email by imploring that "something be done to help address this issue" because it "seems to get worse by the day." (Defendant's Exh. O.) She later told Lewellen that, unless something was done about Knowles' behavior, "things will never improve in OMA." (Defendant's Exh. Q.)
 {¶ 45} On November 4, 1999, Minor sent a memorandum to Alexander detailing the "rude" and "inappropriate" manner in which Knowles spoke to her, as well as instances in which Knowles spoke with her staff about matters that were appropriately addressed directly to her. She stated that, most of the time, Knowles was "abrasive, aggressive, rude and down right nasty." (Defendant's Exh. T.)
 {¶ 46} On December 7, 1999, Alexander sent an email to Lewellen in which he wrote:
 I shared with Dr. Knowles * * * the staff is still unsure of his mission/vision statement. I informed him that he is sharing his statement with different "pockets" of staff, and when they "compare notes" there are a number of contradictions, which is decreasing morale. * * *
 Knowles * * * stated that some of the people who are complaining against him have various issues of their own and was "concerned" that the Administration was "taking with (sic) they say for granted." I reiterated that from my standpoint that I was not taking sides, but felt it was my role to advise him of the concerns out there and help him come up with appropriate strategies to resolve the concerns.
(Defendant's Exh. U.) Though they were unwilling to have their names associated with specific items, OMA directors other than Minor told Alexander that Knowles was "[b]ullying and demeaning"
 {¶ 47} On December 13, 1999, Minor sent another email to Alexander in which she related that, following a staff meeting attended by Provost Ray, Knowles became angry at his staff at the suggestion that they might be too shorthanded to complete a task, and he "went crazy" and "began yelling and reaching across the table." "He was so hostile, it seemed as though he wanted to fight." (Defendant's Exh. W.)
 {¶ 48} After 1999, Alexander continued to receive complaints about Knowles from OMA staff and others within the university. By the end of June 2000, according to Alexander, the work environment in OMA was "dismal" and he expressed to Lewellen his concern over whether Knowles could ever be successful in his position. (Tr., 806.)
 {¶ 49} On cross-examination, Alexander admitted that he agreed with some of Knowles' assessments, including that Smith lacked some of the management skills necessary to perform her job. Alexander said that he may have told Knowles that OMA and YSP had been chaotic prior to Knowles' arrival due to the fact that YSP had recently been moved from the auspices of Academic Affairs to those of OMA. He agreed that he stated, during his deposition, that in August 1999 he believed that everyone at YSP should leave and Knowles should start with a clean slate.
 {¶ 50} Alexander also admitted that Knowles had always behaved professionally with him and that Knowles had, in fact, been a mentor to Alexander. Alexander recognized that Knowles was trying to effect much-needed change at OMA, but the manner in which he chose to do that, Alexander said, caused many problems.
 {¶ 51} In February 2000, Knowles hired Betty Ellis ("Ellis") for the position of Executive Assistant to the Vice Provost, which had formerly been held by Banks. Ellis kept Knowles' calendar, responded to his emails, set up meetings, and generally represented him and the office in dealings with other offices and the public. She also supervised Banks following Banks' demotion. Knowles told Ellis that Banks did not want to do things "the new way" and that the two of them should make Banks miserable enough that she would retire. Knowles related to Ellis that, during his interview process, Smith had challenged him on his views of the issue of affirmative action. He said that because of this he would never make her Director of YSP. Knowles told Ellis that he took the business operations away from Wilson-Hill because she had too much power. Knowles told Ellis that Shipley had better do what Knowles told him to do or he would no longer be working at OMA. Later, Knowles intended to terminate Shipley and specifically planned to do so in Shipley's Mount Hall offices in order to humiliate him; he later decided not to terminate Shipley after word spread of his intent to do so.
 {¶ 52} Ellis testified that Knowles said things that made her uncomfortable. For example, when he told her one day that everyone on OMA's executive council would be gone before he would, and she inquired as to why he thought this, he said because he was the head "N[___er] in charge." She asked him not to use that racial slur with her, and he said, "Sorry, I'm the HNIC." (Tr., 587.) She asked him why he thought he could get rid of everyone else and he replied that it was because "all the white folks upstairs love me." (Tr., 587.)
 {¶ 53} Ellis also related that Knowles berated and badgered staff and that she had gone to Lewellen in June or July 2000 about the way Knowles treated her and Banks. She met with Lewellen a second time in July 2000 and related to him how Knowles would engage in yelling matches with staff and would berate staff members. Ellis admitted she has never filed a formal complaint about Knowles.
 {¶ 54} When Knowles arrived at OSU, Lisa Tochtenhagen ("Tochtenhagen") was the Columbus Regional Director of YSP, having been employed with YSP in various capacities for six years. She left that position in February 2000, in part due to Knowles' treatment of staff.
 {¶ 55} According to Tochtenhagen, Knowles was demeaning to staff and would marginalize certain staff members by communicating with their subordinates regarding issues he should have discussed with them. She also stated that he would ask staff to do things that were impossible to accomplish. Tochtenhagen also related that she had been offended when, while speaking to a group of Young Scholars (most of whom were black) Knowles said that most of the black students among them did not need to be at OSU because they were not competitive enough academically.
 {¶ 56} In Tochtenhagen's opinion, Knowles was not qualified for the position of Vice Provost of OMA because his background was not sufficiently strong in academia because it involved primarily the "maintenance and facilities," or student life components of student affairs.
 {¶ 57} On cross-examination, Tochtenhagen conceded that she agreed with Knowles' decision to remove Smith as Acting Director of YSP because she was not qualified for the position. Rather, she stated, it was the way in which he removed her that made the move unsuccessful because it created tension between Knowles and Smith.
 {¶ 58} Ray also testified on behalf of OSU. He testified that he left OSU in 2003 to accept a university presidency elsewhere, but had been employed with OSU for 33 years, most recently as its Executive Vice President and Provost and Professor of Economics. During Knowles' tenure at OSU, all vice provosts and deans reported to Ray, whose office was located in Academic Affairs.
 {¶ 59} Ray explained to the court certain events that occurred immediately prior to his decision to hire Knowles. In 1998, Barbara Rich ("Rich"), who was then the Vice Provost of OMA, was charged with implementing a proposed reorganization of OMA that had been developed by former Vice Provost Leroy Purnell ("Purnell"). A group of students, including the ASU, protested this proposed reorganization by holding a sit-in in Bricker Hall. As part of a package of promises he made to the protesters in response to their specific demands, Ray told the students that he would remove Rich as Vice Provost and would postpone the reorganization until a permanent vice provost could be hired. He appointed Mac Stewart ("Stewart") as Interim Vice Provost and reconstituted the committee that had been formed to search for a permanent vice provost. At that time Ray's chief goals for OMA included advocating for students, providing tutoring and mentoring for students, and sponsoring activities to promote diversity within the university community. Ray told Mowoe, who headed the search committee, that he wanted a diverse pool of candidates who possessed managerial skills and who could relate well to students.
 {¶ 60} In a meeting with Knowles during the interviewing process, Ray told Knowles that OMA needed someone who could build bridges and relationships, and who could evaluate the suggestions contained in Purnell's proposed reorganization plan.
 {¶ 61} After Ray decided to hire Knowles but before the offer was made, Ray heard talk that Knowles might not be leaving Meharry Medical College voluntarily. Ray asked Mowoe to investigate, after which Mowoe reported that he had spoken to Meharry's president and provost, both of whom said that Knowles was leaving on his own and that they had been satisfied with Knowles's performance.
 {¶ 62} Upon hiring Knowles, Ray spoke with him regarding Ray's expectations. Ray told Knowles that Knowles would need to build camaraderie among the staff, build trust between the students and the university, and connect with the minority community on campus and with the broader, non-university community. After Knowles began work, Ray had several meetings with him to see how things were going and to give Knowles advice regarding the people and resources he could rely on for assistance. Ray and Knowles discussed the goals that Ray had for OMA, both for Knowles' first year and in the long term.
 {¶ 63} Ray related that several members of Knowles' staff, including Smith, Minor, Wilson-Hill, and Shipley, came to him with concerns about Knowles early on. Ray decided to attend one of Knowles' executive staff meetings. Ray reported that the meeting involved "the coldest, most controlled meeting environment" Ray had ever experienced; he further described the interaction between Knowles and his staff at the meeting as "dysfunctional." Ray continued to hear complaints about Knowles through the winter and spring.
 {¶ 64} Finally, after Lewellen offered Ray his own sober assessment of Knowles' management performance, Ray instructed Lewellen to put his concerns in writing. As a result, Lewellen wrote a three-page memorandum to Ray and Rudd dated June 12, 2000. Therein, Lewellen advised Ray and Rudd that "[m]anagement issues in the Office of Minority Affairs have reached a critical point. A decision about leadership * * * must be made quickly to prevent further wholesale deterioration of the culture and undesirable attention from students community." According to Lewellen, though Knowles "appears to articulate meaningful strategies for minority student recruitment and success, * * * his leadership of the office and management of the staff can be characterized as a disaster." (Defendant's Exh. PP.) Lewellen recommended several alternative strategies to assist Knowles in improving the management of OMA and recommended termination if these strategies did not succeed.
 {¶ 65} Upon receiving Lewellen's memorandum, Ray realized that the problems with Knowles' management of OMA might be more serious than he had previously thought. He told Lewellen that he wanted a wide-ranging and systematic evaluation of OMA and the two agreed that this would require interviews with staff. Ray and Lewellen met with Knowles on June 15 or 16, 2000, and Ray told Knowles about the concerns voiced in Lewellen's memorandum. Ray advised that he had decided that interviews of OMA staff and non-OMA staff would be appropriate.
 {¶ 66} According to Ray he advised Knowles that he would make decisions about the future of Knowles' employment based in part on the results of those interviews, and that he would consider options ranging from management training courses for Knowles, to hiring a second-in-command to work with staff while Knowles worked with students and the larger community, to termination based on unsatisfactory performance. According to Knowles, however, Ray never indicated that Knowles' job might be in jeopardy based on the results of these interviews.
 {¶ 67} Ray testified that he had scheduled a June 28, 2000 meeting in order to give Knowles his performance review, but did not hold the meeting because he was awaiting the results of Lewellen's interviews. He stated he informed Knowles that the meeting would not occur until after Ray received Lewellen's report. He stated that he sent Knowles the June 21, 2000 letter regarding a salary increase only because salary increase requests were due no later than June 22, 2000, and he needed to hold a place for an increase for Knowles in the event he later decided that such an increase was warranted.
 {¶ 68} Three to four weeks after Ray advised Knowles of the need for staff interviews, Lewellen submitted to Ray a 20-page report of the results of those interviews. The report does not contain opinions or recommendations from Lewellen. It does contain the list of individuals interviewed, the text of the script Lewellen used for each interview, and lists of positive and negative comments expressed by each interviewee.
 {¶ 69} Upon receiving this report, Ray decided to terminate Knowles' employment. Ray testified that he was not satisfied with Knowles' performance. He held a meeting with Knowles and Lewellen to inform Knowles of the results of the interviews and to inform him of Ray's decision to terminate him. Ray testified that he told Knowles that the report was the "last piece" he needed to make his decision. After Knowles failed to avail himself of the opportunity to resign, Ray terminated Knowles by letter effective July 31, 2000.
 {¶ 70} Lewellen testified on behalf of OSU. He has been employed at OSU since 1987 and since 1998 has held the position of Associate Vice President of Human Resources, which is the university's chief HR officer. He holds a bachelor's degree in personnel and industrial relations and a master's degree in business administration.Before he worked at OSU he was the director of HR for a three-plant division of a corporation.
 {¶ 71} Lewellen first heard concerns about Knowles after Knowles attended a YSP event and picnic in late July 1999, just prior to the start of his employment term. According to Lewellen, a staff member approached Knowles and asked him to join their table for the meal, and Knowles replied, "Why are you trying to ingratiate yourself to me?" On August 12, 1999, Smith approached Lewellen because she thought that Knowles was retaliating against her because she had disagreed with him during one of his interviews. She told Lewellen that Knowles removed her as Acting Director of YSP while she was away on vacation, after he had encouraged her to apply for the permanent position. A few days later Lewellen emailed his supervisor, Sheri Boggs, to report this conversation, and recommended that she enlist the help of Olga Escaville-Gonzales ("Gonzales"), Associate Director of Consulting Services and Employee Relations, to talk to Smith about the situation.
 {¶ 72} On August 19, 1999, Lewellen received an email from Alexander informing him that Wilson-Hill had complained that Knowles had summarily taken her business operations duties from her despite the fact that Rich had recently added these duties to Wilson-Hill's job description. Alexander noted that Wilson-Hill had been the Director of Special Programs for OMA for a long time and had a "wonderful record of accomplishments." (Tr., 1229.) Alexander recommended that the services of Don Chenoweth, an organizational development consultant, be made available to Knowles, and Lewellen agreed.
 {¶ 73} On September 22, 1999, Lewellen and Alexander met with Knowles to discuss staffing issues and to make several recommendations to Knowles, including the use of Don Chenoweth's services. They indicated to Knowles that they were hearing about communication issues and they recommended that Knowles take certain steps to resolve those issues, including developing and communicating to staff a clear mission and strategy for OMA and a statement of how each individual director would fit into that strategy. Lewellen followed up with an October 15, 1999 memorandum to Knowles regarding the various issues discussed.
 {¶ 74} Two days later, Smith filed a formal complaint of retaliation and harassment against Knowles. Alexander also received numerous communications from Minor, which he forwarded to Lewellen, in which she complained of poor treatment by Knowles. After speaking with Gonzales about the results of her conversations with Smith, Lewellen told Alexander that he felt Knowles' management style was forcing Lewellen to put more emphasis on "protecting" staff. Lewellen also testified about his becoming aware of Minor's complaints. By the end of November 1999, Alexander was of the opinion that Knowles failed to appreciate the gravity or understand the nature of the complaints, especially those related to communication issues and a lack of clarity among staff regarding Knowles' vision for the direction of OMA.
 {¶ 75} Lewellen corroborated that he and Alexander met with Knowles in early December and recommended that he hold an all-staff meeting to address everyone's questions and concerns about the office, and to clarify to all of the staff his vision and what role he expected the staff to play in carrying out that vision. Lewellen testified that Knowles resisted the idea and was upset by it, stating that no one ever does that.
 {¶ 76} Several days later, Reggie Anglen, who worked in OSU's office of University Relations, contacted Lewellen to express concerns that there was a lack of clarity as to what was expected of staff in OMA, and that Knowles seemed to want to share details of personnel issues with whomever would listen rather than maintaining the proper protocols for such discussions. Lewellen later had Alexander tell Knowles that the Office of Academic Affairs was going to require Knowles to hold an all-staff meeting. Knowles finally did so by holding a "retreat" in February 2000 at the Faculty Club. However, staff reported that Knowles' demeanor at the retreat suggested that he was "uninvested" and uninterested, even to the point that he dozed off at times during the event.
 {¶ 77} After continuing to hear complaints that the situation at OMA was not improving, Lewellen discussed with Rudd and Ray the idea of placing an additional layer of management between Knowles and his staff in order to manage the "people issues." Later, Lewellen was made aware of several instances in which Knowles had breached agreements he had made with staff, and denied ever making those agreements. For instance, an OMA program manager reported that she had developed a proposal based on Knowles' pledge that whoever did so would receive a $5,000 bonus, but when she submitted her proposal Knowles told her he had only promised $500 and would give her only $250. Lewellen spoke with other OMA directors who corroborated that Knowles had promised $5,000. Shipley reported to Lewellen that Knowles had made budget and staffing commitments to Shipley and later denied ever making them. Shipley also reported that Knowles had asked Shipley to discipline other staff without appropriate foundation to do so, and Shipley feared he would be retaliated against for refusing to do so.
 {¶ 78} Dr. David Williams, Vice President of Student and Urban Affairs, approached Lewellen to say that Knowles was out of control with respect to the way he was managing OMA. Williams stated that he had tried to be helpful by introducing Knowles to prominent people in the Columbus community, but Knowles had "put his foot in his mouth" on those occasions, so Williams stopped making the introductions. Lewellen advised Ray about Williams' concerns.
 {¶ 79} After Lewellen put his concerns into a memorandum to Ray, Lewellen suggested that they interview additional OMA staff to ensure that they were not "just hearing from complainers." (Tr., 1320.) Lewellen confirmed that he attended a meeting with Ray and Knowles during which Ray advised Knowles that concerns about Knowles' management of OMA persisted and that Ray would be seeking a more detailed assessment through interviews with OMA staff. Ray, Lewellen and Knowles agreed that they would speak with more than just the people who Knowles felt were not doing their jobs.
 {¶ 80} During the last week of June 2000, Lewellen interviewed 19 people, either in person or via telephone. He chose interviewees based upon "the directive as I had received it [which] was to make sure and speak to people who would regularly interact with Dr. Knowles on a regular basis but who had not registered complaints * * * so that I would be getting a completely different sample of opinions than the people who had already approach[ed] the Office of Human Resources." (Tr., 1328.) Lewellen testified that he made sure he selected people from every area of OMA, including a student employee who was a member of ASU. No one was forced to speak with Lewellen. He followed an established script with each interviewee, beginning with a solicitation of positive comments, and moving later to an invitation to voice any concerns interviewees had with regard to Knowles' management style. Each interviewee had the choice whether they wished to have their comments included in his report. After they were finished, Lewellen would read to each interviewee his notes to ensure that they were accurate.
 {¶ 81} Tochtenhagen was one of Lewellen's interviewees. She testified that Lewellen did not steer her toward a particular "side." He gave her an opportunity to express positive things about Knowles, and then moved toward whether she had any concerns about Knowles. She felt that Lewellen was conducting a fair evaluation process. Walton, on the other hand, testified she felt that Lewellen was seeking more information about what Knowles was doing wrong than any positive comments.
 {¶ 82} A review of Lewellen's report reveals that two of the interviewees had nothing but positive things to say about Knowles. Three interviewees had nothing but negative things to say about him. Lewellen's notes from the remaining 12 interviews include comments such as "there is a lack of clarity for the office"; Knowles "has a complete void of relations with the community [and] any relations he has are poor"; "I've learned not to give my opinion"; "I hear from community leaders, state representatives, school board officials, who ask me `What's going on with him?' "; "Tim doesn't understand Ohio State"; "Tim is shady, I don't trust him"; "OMA is particularly divided at the director level; this will severely inhibit our effectiveness"; "Tim has no sense of public decorum"; "We made a mistake in hiring him"; "He has done irreversible damage to OMA"; "I've never seen our working atmosphere so poor"; "Tim has established procedures for certain actions, then violated them blatantly"; "I know the `big picture' from Tim, and understand it, but he bogs down at translation into action [and] implementation doesn't happen. Tim sits on issues for 90 days or more — OMA products and issues are constantly moving, we need much faster action."
 {¶ 83} In its decision to render judgment in OSU's favor on Knowles' breach of contract claim, the trial court made numerous findings. It found that Knowles and Ray agreed on a clearly defined set of goals at the outset of Knowles' employment, including strengthening OMA's organization, developing a mission statement, enhancing management and recruitment and expanding campus and community outreach. Ray's testimony is competent, credible evidence supporting these findings.
 {¶ 84} The court found that neither Ray nor Lewellen displayed a lack of good faith and the two did not conspire against Knowles, as Knowles had claimed. The court found that Ray did not display lack of good faith in relying on Lewellen's findings without personally verifying each one; Lewellen was a trained and experienced HR professional who was qualified to conduct the investigation, and the manner in which Lewellen conducted his investigation was fair, reasonable and reliable. The court also found that the HR personnel who gave information to Lewellen, such as Alexander, were competent and capable. The court found that Ray acted reasonably and in good faith in keeping Knowles apprised of the investigation, the substance of the concerns being addressed, Knowles' perceived strengths and weaknesses, and what Knowles needed to do in order to succeed. The testimony of Ray, Lewellen and Alexander is competent, credible evidence supporting these findings.
 {¶ 85} The court found that Knowles did not receive an annual review, and that Ray did not commit to keeping Knowles on by sending the June 21, 2000 letter advising of the annual salary increase. This is supported by competent, credible evidence. Both Ray and Lewellen testified that it was standard practice to put in a salary increase request as a "placeholder" for those employees who had not yet received their annual reviews by the time that salary requests were due. The June 21, 2000 letter contains no mention of, or reference to, Knowles' annual review.
 {¶ 86} The court found that Ray was subjectively dissatisfied with Knowles' performance and that Knowles had failed to achieve the goals that had previously been defined for him. This is supported by competent, credible evidence. Ray testified about the numerous problems of which he was aware throughout Knowles' tenure at OSU, and that, despite attempts by him and the HR staff to assist Knowles, the concerns only grew worse over time. The concerns centered around all of the goals that Ray had set forth for OMA; that is, strengthening OMA as an organization, developing a clear mission statement, enhancing management of OMA programs, and community outreach.
 {¶ 87} The evidence demonstrates that Knowles was not without accomplishment during his tenure, and many appreciated his direct and focused style. There is no doubt that OMA had been suffering from numerous problems involving staffing and relations with students and the community at large, and Knowles inherited many challenges when he accepted the position of Vice Provost. It is also clear that he took seriously his commitment to effect change and to streamline and improve services to students. Indeed, the witnesses for both parties expressed few doubts that Knowles tried to be successful in meeting the challenges he faced.
 {¶ 88} However, the evidence is overwhelming that Knowles was ultimately unsuccessful. This was primarily due to his caustic style of interpersonal communications and sometimes his failure to communicate when communication was critically needed, his inability to retain the trust of his staff, his offensive comments made to staff and to some of the constituency that OMA is designed to serve, his inconsistent approach to problemsolving, and his refusal to avail himself of the services and suggestions being offered by Ray and the HR staff.
 {¶ 89} Upon our thorough review of the record, we conclude that competent, credible evidence supports the trial court's judgment in favor of OSU on Knowles's breach of contract claim. Accordingly, Knowles' first assignment of error is overruled.
 {¶ 90} In support of his second assignment of error, Knowles argues that the court erred in awarding an "unreasonably low" amount of damages on his slander-based defamation claim. This claim arises from Knowles' allegation that Ray slandered him in a meeting held after his termination. He alleged that Ray told students at the Hale Black Cultural Center that Knowles had been fired from Meharry Medical College and that Rayhad terminated him because he had lied on his application about the circumstances of his departure from Meharry. The trial court found that Ray had indeed made this statement, and Ray admitted during his testimony that such a statement, if made, was false. Thus, the trial court entered judgment in Knowles' favor on his slander-based defamation claim.
 {¶ 91} Knowles now argues that the amount of damages awarded — $25,025 — was unreasonably low. Knowles and his wife testified at trial that, as a result of Ray's slanderous statement, he suffered embarrassment, loss of reputation, frustration, anger, sleeplessness and worry. He argues that, in light of this testimony, the trial court's damage award fails to accomplish the aims of damage awards in defamation cases.
 {¶ 92} OSU argues that the record contains no evidence supporting the trial court's award of damages to Knowles. OSU points out that the remark that the trial court found to be slanderous was made to a small group of OSU students and there is no evidence that the remark was repeated to anyone outside that group.
 {¶ 93} OSU's position is not well-taken because, owing to the fact that the slander here constituted defamation per se, damages are presumed. Slander per se means that the slander is accomplished by the very words spoken. Leal v. Holtvogt (1998), 123 Ohio App. 3d 51, 81,702 N.E.2d 1246. A statement that "tends to injure one in one's trade or occupation" will be considered slander per se. McCartney v. Oblates ofSt. Francis deSales (1992), 80 Ohio App. 3d 345, 353, 609 N.E.2d 216. As we stated in Knowles I, "the defamatory statement Provost Ray allegedly made, if proven to have been made, would constitute slander per se because the statement tends to injure plaintiff's professional reputation." Knowles v. Ohio State University, 10th Dist. No. 02AP527, 2002-Ohio-6962, ¶ 26. When a statement is found to be defamation per se, both damages and actual malice are presumed to exist.Dodley v. Budget Car Sales, Inc. (Apr. 20, 1999), 10th
Dist. No. 98AP-530, citing Westropp v. E.W. Scripps Co. (1947),148 Ohio St. 365, 35 O.O. 341, 74 N.E.2d 340, paragraph four of the syllabus. Thus, damages need not be proven.
 {¶ 94} As a general rule, damage awards in defamation cases are conceived of as serving three separate purposes: (1) to compensate plaintiff for injury to his reputation and his emotional distress; (2) to vindicate him and to aid in restoring his reputation and; (3) to dissuade defendant and others from publishing defamatory statements. Restatement of the Law 2d, Torts (1977) Section 623. With these purposes in mind we are unpersuaded that the trial court's damage award was unreasonable. Accordingly, Knowles' second assignment of error is overruled.
 {¶ 95} In support of his third assignment of error, Knowles argues that the trial court erred in finding that OSU did not libel him because the written statements upon which he based his claim for libel were true.
 {¶ 96} Knowles' libel claim is based upon articles that appeared in the Columbus Call and Post and the Columbus Dispatch newspapers, which were subsequently included within an internal publication of university — related clippings called the "Ohio State News Digest." The articles reported that plaintiff was "under investigation for allegations of mismanagement, inappropriate communication with staff, harassment, retaliatory behavior and violation of other University policy." The evidence amply supports the trial court's conclusion that these statements were true at the time they were printed.
 {¶ 97} Knowles' libel claim is also based upon an article in a periodical entitled, Black Issues in Higher Education, in which Ray is quoted as saying that the decision to terminate Knowles involved "issues of trust" concerning Knowles. The trial court's finding that this statement was true is supported by evidence of the many misgivings that OMA staff had about whether Knowles was truthful with them, whether he gave different parties conflicting explanations and information, whether he would go back on promises he had made, whether he would deny that he had made certain statements or promises upon which they had relied, and whether he surreptitiously undermined them.
 {¶ 98} Because the trial court's findings on Knowles' libel-based defamation claim are supported by competent, credible evidence, we overrule Knowles' third and final assignment of error.
 {¶ 99} We now turn to OSU's cross-appeal, which challenges the trial court's judgment in Knowles' favor on his claim for defamation based upon Ray's slanderous statement to students following Knowles' termination.
 {¶ 100} In support of its first assignment of error, OSU argues that the trial court's finding that Ray made the statement is against the manifest weight of the evidence. Ray denied making the statement. OSU argues that Ray's testimony is buttressed by the testimony of Stewart, who served as Interim Vice Provost for OMA following Knowles' departure. Stewart testified that he attended the post-termination meeting with students at the Hale Black Cultural Center. He further testified that Ray did not mention Meharry Medical College and did not say that Knowles had been terminated for lying on his application. In addition, Lewellen testified that Ray told the group that Knowles had been terminated due to his management style. OSU also points out that it would not have been in Ray's interest to make the slanderous statement because it would have been tantamount to an admission that he had failed to conduct appropriate reference checks prior to appointing Knowles to his position.
 {¶ 101} Ali testified that she also attended this meeting with students and that Ray indeed told the group that Knowles had been terminated from OSU because he had lied on his application, and that he had been fired by Meharry Medical College. The trial court stated in its decision that it found Ali's testimony to be more credible than that of Ray. "In the face of conflicting testimony, `the weight to be given to the evidence and the credibility of the witnesses must be primarily reserved to the trier of fact, and it is not for us to disturb its decision.' The trier of fact has the benefit of seeing and hearing the witnesses testify and is in the best position to determine the facts of the case." In re Jones (Sept. 30, 1998), 10th Dist. No. 98AP-152, 1998 Ohio App. LEXIS 4679, at *10-11. (Citations omitted.) See, also, Barney v. Barney (Mar. 4, 1997), 10th Dist. No. 96APF06-754. We see no compelling reason to disturb the trial court's assessment of the witness' credibility in this case. Accordingly, OSU's first assignment of error is overruled.
 {¶ 102} In its second assignment of error, OSU argues that the damage award on Knowles' slander claim is without evidentiary basis and Knowles was entitled to, at most, nominal damages. OSU maintains that while damages may be presumed to exist in cases of slander per se, it may not be presumed that the amount of such damages exceeds a nominal amount. While OSU cites case law from the State of New York for support of this proposition, it cites no Ohio authority and we are aware of none. The evidence supports the trial court's conclusion that the humiliation and other damages to which Knowles and his wife testified were causally related, at least in part, to the slander. Thus, we do not find the trial court's damage award to be unreasonable or unlawful. Accordingly, OSU's second assignment of error is overruled.
 {¶ 103} Having overruled both parties' assignments of error, we affirm the judgment of the Ohio Court of Claims.
Judgment affirmed.
McGRATH and TRAVIS, JJ., concur.