**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0121n.06

Case No. 17-3392

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 09, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DORE & ASSOCIATES CONTRACTING, INC., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE SOUTHERN DISTRICT OF |
| | ) | OHIO |
| CITY OF COLUMBUS, OHIO, | ) | |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

BEFORE: DAUGHTREY, McKEAGUE, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Plaintiff Dore & Associates Contracting, Inc. ("Dore") appeals the district court's grant of judgment on the pleadings in favor of Defendant City of Columbus, Ohio (the "City"). We find that the district court was correct in finding that the plain language of the contract required Dore to perform the work as set forth therein, regardless of whether Dore agreed with the soundness or necessity of that work. If Dore wished to alter the scope of the work it contracted to perform, there were prescribed methods for doing so. Dore failed to employ those mechanisms and was therefore bound to perform the contract as specified. We AFFIRM the judgment of the district court.

I

On May 3, 2013, the City of Columbus issued a Construction Project Proposal soliciting bids for the demolition of a building. The Proposal sought bids for the removal and disposal of asbestos-containing materials ("ACM") in accordance with the technical specifications for abatement of hazardous materials ("Hazmat Specs"). The specifications were set forth in the bid documents and incorporated into the contract, along with the Proposal and solicitation for bids. The Hazmat Specs referred bidders to "Attachment 1," a Hazardous Material Assessment Report ("Lawhon Report") authored by Lawhon & Associates, a licensed hazardous materials inspection firm retained by the City. The Lawhon Report estimated 218,000 square feet of asbestos-containing plaster on the site. The Hazmat Specs stated that the report should not be used for "bidding or notification purposes." (RE 1-2, PageID #251.) The Hazmat Specs "included" the Lawhon Report, but qualified that the report was "to be used as a reference only." (RE 12-1, Hazmat Specs § 1.3(A)(1), PageID #701.) The City expressly disclaimed any responsibility for the accuracy of the estimates. Section 1.3(B)–(C) of the Specifications provided the following instructions:

> B. **Site Investigation**. The Hazardous Materials Abatement Contractor shall conduct a site investigation prior to submission of bid to verify asbestos containing materials locations and quantities within the building. The contractor will be responsible for removing and disposing of all asbestos containing materials (except roofing materials) throughout the entire building. The contractor must submit in writing, within 72 hours of bids, any exceptions or discrepancies to this section. If no exceptions are made, the winning contractor will be held responsible for removal and disposal of all asbestos containing materials within the building, identified or not.
>
> C. **Removal and Disposal**. The Hazardous Material Abatement Contractor, as directed, shall remove and dispose of <u>all</u> regulated asbestos containing materials (RACM), Category II and Category I asbestos containing materials ([e]xcept roofing materials) throughout [the site]. The quantities provided below are only estimations based on the [Lawhon Report]. The City, Architect and [Lawhon] assume no responsibility for the accuracy of these estimates. The contractor shall

- 2 -

review the [Lawhon] Report in conjunction with site investigations, other specification sections and project drawings and confirm all existing site conditions prior to submission of his/her bid.

(*Id.*)

The Hazmat Specs also contained "General Notes," which explained:

1. Listed quantities and locations are only estimates. The contractor is responsible to verify all quantities, special conditions, locations and bidding according to their findings. It is strongly encouraged that the bidding contractor conduct a site investigation to verify materials and quantities prior to bid. Any exceptions to the materials and quantities listed in [the Hazmat Specs] or the [Lawhon Report] must be submitted in writing prior to 72 hours before bids are due. If no exceptions are made, then the contractor will be responsible to remove and dispose of all asbestos containing materials, identified or not within the building.

2. Any materials which have not been listed in the [Lawhon Report] and not tested for asbestos content must be tested by the Hazardous Materials Abatement Contractor. Results of this testing must be submitted to the Project Architect for review and approval. [Lawhon] reserves the right to conduct side-by-side testing to confirm results of the [contractor's] testing.

(*Id.*, Hazmat Specs § 1.3(H), PageID #705.)

As a potential bidder, Dore conducted the mandated pre-bid site inspection and concluded that the Lawhon Report over-estimated the amount of ACM in the building. Five days before bids were due, the City filed a document entitled Addendum No. 1 ("Addendum"), which was to "take full and complete precedence over anything stated or shown to the contrary in them," and stated that "all of the plaster is confirmed to contain asbestos and is to be removed." (RE 1-1, PageID #7.) Dore received the Addendum and did not file an exception or otherwise object, although it contemporaneously considered the Addendum incorrect and, according to its pleadings, had no intention of removing all plaster or altering its bid to include the cost of such abatement. Based on its estimations, Dore submitted a bid of $1,677,000;

$1,051,100 of Dore's bid was allotted to hazardous materials abatement. Dore submitted no exceptions—to the Lawhon Report or otherwise.

On August 2, 2013, the City awarded Dore the contract. Before commencing its work, Dore hired another consultant to conduct detailed testing of the site plaster. The consultant determined that there were 43,500 square feet of ACM in the building—similar to Dore's estimate. Dore submitted the estimate to the City, which rejected it. In hopes of reversing the City's rejection, Dore submitted the consultant's report to the Ohio Environmental Protection Agency, which determined that Dore's estimate was an "accurate and safe finding of ACM." (RE 1, PageID #3.) Nevertheless, the City rejected Dore's second request for approval of its estimate. Undeterred, Dore notified the City that it would begin abatement in accordance with its own estimates. The City then threatened to declare Dore in default. Dore relented and began its abatement of the materials identified in the Lawhon Report, including all plaster, under protest. In doing so, Dore spent $1,195,794.58 more in material and labor costs than if Dore had been permitted to abate only the asbestos identified in its own estimates.

On July 31, 2015, Dore filed a breach of contract claim against the City to recover damages for its additional material and labor costs. On March 14, 2017, the district court granted the City judgment on the pleadings and dismissed the case. The district court ruled that the Hazmat Specs, including the Lawhon Report estimates, were incorporated into the contract and that Dore had agreed to perform as specified therein. If Dore wished to remove less material than was identified in the Lawhon Report, the district court found, Dore was required to submit a pre-bid exception. The district court also found that the City's Addendum provided Dore further notice of the City's expectations and another opportunity to file an exception. The present appeal followed.

II

We review a district court's grant of a Rule 12(c) motion for judgment on the pleadings de novo. *See Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006). "The manner of review under Rule 12(c) is the same as a review under Rule 12(b)(6) . . . ." *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006). We must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *See Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999).

III

To establish a claim for breach of contract, the plaintiff must prove "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Siemaszko v. FirstEnergy Nuclear Operating, Co.*, 932 N.E.2d 414, 419 (Ohio Ct. App. 2010) (citation omitted). Neither party disputes that a valid contract existed. The only conflict for us to resolve is what that contract required.

Under the plain language of the contract—which incorporated the Lawhon Report and its estimates—Dore agreed to perform in accordance with the Hazmat Specs. The Hazmat Specs required the winning bidder to abate and remove all of the ACM identified in the Lawhon Report and any further ACM the contractor identified in its pre-bid inspection. If Dore disagreed with those estimates after performing its own required inspection, the contract specifically contemplated that Dore would "submit in writing, within 72 hours of bids, any exceptions or discrepancies." (RE 12-1, Hazmat Specs § 1.3(A)(1), PageID #701.) Dore failed to do so, binding it to the estimates in the Lawhon Report. To hold otherwise would render § 1.3(B) meaningless. *See Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities*

*Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) ("In the construction of a contract courts should give effect, if possible, to every provision therein contained.").

Moreover, the City's Addendum removed all doubt about what the contract required. Explicitly taking precedence "over anything stated or shown to the contrary," the Addendum declared that all of the plaster contained asbestos and mandated its removal. (RE 1-1, PageID #7.) By again failing to file an exception to the Addendum, Dore became bound by it and therefore obligated to remove all plaster.

As addressed below, Dore's unavailing arguments are contrary to the plain language of the contract. First, the district court did not substitute itself for the jury, nor did it make any factual determination on disputed issues. Rather, the district court properly made a legal determination regarding what the contract required. Second, the general purpose of the contract—to remove all ACM—does not override its specific provisions. *See Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 420 (6th Cir. 2008) ("Well-founded principles of contract law establish that 'specific terms and exact terms are given greater weight than general language.'") (quoting *Restatement (Second) of Contracts*, § 203 (1981)); *Gibbons-Grable Co. v. Gilbane Bldg. Co.*, 517 N.E.2d 559, 564 (Ohio Ct. App. 1986) ("It is also well-established in Ohio that where two clauses of a contract appear to be inconsistent, the specific clause prevails over the general.") (citation omitted). Section 1.3(B) provides specific requirements that define the contours of the agreement's general purpose. Were we to read § 1.3(B) as a joint-risk provision, as Dore urges, it would cede the determination over the scope of the work from the City to the contractor. Instead, the City controlled the scope of work and the contract prescribed a method for seeking modification—the filing of an exception. Similarly, while the phrase "identified or not" may be read to the benefit of each party, it nonetheless

specifies that the contractor must, at the very least, remove all identified ACM. When drafted, the Lawhon Report identified a certain amount of ACM. Dore was thus required to remove that ACM, absent any subsequent exceptions, as well as any unidentified ACM. The provision did not state, as Dore seemingly contends, that the contractor was required to remove only the ACM that the contractor itself identified. Finally, Dore's argument that the Addendum simply clarified the contract, rather than added specifications, is meritless. The Addendum was explicit in its mandate that it superseded all previous specifications and that all plaster be removed.

IV.

Though we believe our decision is a clear one, a vociferous and lengthy dissent follows. The dissent proposes a new rule of contract construction as well as a fanciful construction of facts preferred by the dissent. Because the dissent touts "Dore's superior understanding of the site's asbestos content," and, in turn, its own superior understanding of contract interpretation, controlling precedent, construction jurisprudence, and asbestos abatement, we are compelled to address some of its misapprehensions.

We first note misconceptions underlying the entirety of the dissent. First, it misconstrues the timing of most key events. For example, the dissent states that "Dore found that there was less asbestos present than it initially thought" "[u]pon starting work." This is demonstrably false. Dore believed there to be less ACM in the building long before starting work and prepared a bid accordingly, disregarding the specifications of the contract. This move allowed Dore to undercut the competition and to do so in the face of the Lawhon Report and the Addendum. Second, the dissent similarly misstates the timing of the addendum, intimating that it was only in-effect or enforced after Dore entered the winning bid. This misconception permeates the dissent, allowing it to describe the City's compliance demand as allowing it to extract free labor and attempting to

win on a footnote. But Dore knew of the Addendum and its clear provisions before it signed any contract. It ignored the Addendum at its own peril. The Court is not permitted to redraft the bid documents, nor protect a party that chooses to blatantly disregard contract provisions.

Much of the dissent attaches its reasoning to the plain language of the contract, attesting that it required Dore "to remove only 'asbestos containing materials.'" Tellingly, the word "only" is present in the dissent, but is not found in the contract. Further, several of the dissent's contract excerpts do not support the dissent's conclusion. For example, § 1.3(B) indeed states that the contractor will be responsible for removing "all asbestos containing materials." But the dissent disregards that the contract does not state that the contractor will be responsible for removing all asbestos containing materials *as determined by the contractor*. Similarly, when the contract states that if no exceptions were made, the contractor would be held responsible for removing all ACM "identified or not," the dissent chooses to ignore that the only ACM then-identified was in the Lawhon Report. There can be no dispute that the Addendum confirmed those identified materials contained asbestos. While the contract's directive was clear—to abate all materials that contain asbestos—the determination of what materials contained asbestos was also included in the contract and the pre-bid Addendum.

While the dissent takes strong exception to our reasoning, the method employed in the dissent construing the requirement that Dore file an exception is tortured, and a gross deviation from the fundamentals of contract construction. If the purpose of that requirement is not to seek an exception from the Lawhon Report or Addendum, it apparently would exist only to require the contractor to file an exception to permit it *not* to abate confirmed asbestos—the very purpose of the contract that the dissent so fervently advocates. Moreover, to allow a contractor to remove or destroy asbestos without the proper abatement procedures would likely violate various

regulations and laws. *See, e.g.*, 40 C.F.R. § 61(M); O.A.C. § 3745-20. This cannot be true. The dissent also says that it is demonstrably false that "failing to file a pre-bid exception automatically incorporates" the ACM in the Lawhon Report. If the dissent is correct, what would be the purpose of filing an exception at all? There would be nothing to which to file an exception. If there is no incorporation of the Lawhon Report and Addendum, again, the only hypothetical exception would be to allow the contractor not to abate ACM, undermining the purpose for the contract's entire existence.

As to the Addendum, the dissent attempts to strip it of meaning by stating that it was buried it in a 300-page contract. True, the contract was voluminous. The Addendum, however, was not. It was filed separately, as a pre-bid document, explicitly to "become as fully a part of the above named Contract Documents as if included," and spans three pages in its entirety. It is wholly unclear how this concise and pointed Addendum could be ambiguous to basic parties, let alone a sophisticated contractor. One method the dissent uses to construe the Addendum as such is to hinge its reading on the fact that the Addendum states that the confirmed plaster is to be "removed." The dissent contends that a contractor could reasonably understand that this required all plaster to be removed, rather than abated, thereby limiting the costs associated with it. Again, this ignores the realities of the contract, including its overall purpose of the contract as extolled by the dissent—to abate the ACM as determined by the City—as well as the regulatory requirements that demand abatement of confirmed ACM pursuant to exact specifications or face legal consequences. Finally, the dissent states that our reading of the Addendum renders the change-of-work and changed-circumstances provisions of the contract unwarrantedly meaningless. We disagree. Regardless, such a reading would be permissible and perhaps intended—it explicitly and overtly took full and complete precedence over everything before it

and was issued prior to the signing of any agreement. The dissent is correct that there are many things the "[A]ddendum doesn't say." But we do know what it does say: the party for whom the contract is to satisfy—the City—has confirmed that all plaster contains ACM and any winning bidder must eliminate it accordingly.

Though the dissent disagrees with much, if not all, of the majority opinion, on one point we agree: parties will be held to their written agreements, including the consequences of ignoring them.

V

The contract required Dore to abate all ACM in the building to the City's satisfaction, and the parameters of that abatement work were included in the contract, Lawhon Report, and Addendum. If Dore believed that the contract required more abatement than was necessary, it was obligated to file an exception. This requirement was explicit, binding, and cannot be read out of the contract by this Court. The district court was correct. Accordingly, we **AFFIRM** the decision of the district court.

**DAVID W. MCKEAGUE, Circuit Judge, dissenting.** Dore and the City signed a contract requiring Dore to abate all the asbestos from a building. The majority, somehow, concludes from this that Dore was required to abate things that were not asbestos. It also concludes that the City has the unreviewable authority to declare, as a matter of law, that something contains asbestos. Finally, it condemns Dore for "undercut[ting] the competition" in the competitive-bidding environment established by the State of Ohio, as if that conduct is somehow a vice. This reasoning is incomprehensible, and is more fit for the Court of the Mad Hatter than the Court of Appeals. Because I cannot join the majority's Adventure in Wonderland, I dissent from the opinion of the Court.

## I

The background to this case is relatively ordinary. The City wanted to demolish a building in downtown Columbus. It thought the building contained asbestos. It was right. It hired an asbestos-abatement contractor (Dore) to abate the asbestos. The contract held Dore responsible for "removing and disposing of all asbestos containing materials (except roofing materials) throughout the entire building." R. 12-1, Hazmat Specs § 1.3(B), PID 701. During bidding, Dore inspected the premises and, based on its professional experience, suspected that there was less asbestos than the City thought. It bid accordingly, and won the contract. Afterwards, Dore hired a consultant to scientifically confirm the exact amount of asbestos in the building. The consultant reported that there was 45,000 square feet of asbestos present, rather than the 218,000 square feet estimated by the City's consultant. Dore submitted a plan to remove the asbestos from the building. So far, so good.

The City, however, did what owners sometimes do: It rejected the contractor's plan. Instead, it demanded that Dore abate all the plaster in the building as if it contained asbestos.

This new project cost Dore an extra $1.1 million in expenses not covered by the contract price. So Dore sued.

The procedural posture of this case is also ordinary. The City moved for judgment on the pleadings before any factual argument or discovery, contending that the contract unambiguously required Dore to perform the extra work demanded. Under long-standing rules of civil procedure, the complaint could only be dismissed if the City was "clearly entitled to judgment" because it had the only tenable interpretation of the contract. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). If Dore made any rational argument that the City's interpretation of the contract was wrong, the district court was required to deny the motion to dismiss. *Id.* Moreover, the district court was obligated to use Dore's version of the facts when conducting this analysis: because the City moved to dismiss the case, the non-movant's facts are accepted as true. *Id.* Among these facts are Dore's assertion that the building only contained 45,000 square feet of asbestos containing plaster (not 218,000 square feet), and that the remaining plaster <u>did not</u> contain asbestos. *See* R. 1, Compl., ¶¶ 30–31, 36, PID 4–5. In other words, even if Dore's tests were flawed and the City's demand was justified, this was not the time to decide that issue.

This is where we are dragged down the rabbit hole, and we find ourselves in the City of Wonderland—the fantastical, alternate dimension of the City of Columbus. The district court, inexplicably, accepted the City's view of the facts and held that Dore was required to abate all the plaster. Further, it held that this conclusion was the only rational one to be drawn from the contract language. How, you ask, might a contract for the removal of asbestos indisputably have required a contractor to pretend things contain asbestos when the court must assume that they do not? Your guess is as good as mine.

Neither the majority nor the district court identify language in the contract requiring Dore to abate all the plaster in the building, regardless of whether it contained asbestos. Indeed, the contract is expressly limited to things that <u>do</u> contain asbestos. Take the following quotes, straight from the contract, which comprise the crucial language at issue in this case (emphasis added):

- "The contractor will be responsible for removing and disposing of all *asbestos containing materials* (except roofing materials) throughout the entire building." R. 12-1, Hazmat Specs § 1.3(B), PID 701.

- "If no exceptions are made, the winning contractor will be held responsible for removal and disposal of all *asbestos containing materials* within the building, identified or not." *Id.*

- "The Hazardous Material Abatement Contractor, as directed, shall remove and dispose of <u>all</u> regulated *asbestos containing materials* (RACM) . . . throughout 99-109 North Front Street." *Id.* § 1.3(C) (underlining in original).

- "Remove and dispose of the following *asbestos containing materials* . . . ." *Id.* at 702.

- "The following is a list of materials sampled and *confirmed to contain asbestos*." *Id.*, Lawhon Report § 3.1, PID 735.

- "[T]he hard plaster base coat has been reported as a *regulated asbestos containing material* by EPA, ODH and OSHA and must be removed. . . ." *Id.* § 3.3, PID 736.

- "[A]ll of the plaster is confirmed to *contain asbestos* and is to be removed . . . ." *Id.*, Addendum 01, PID 511.

The plain meaning of these words is obvious: Dore must abate materials that contain asbestos. It need not abate materials that do not contain asbestos.

Not so, in the City of Wonderland. Under the majority's reasoning, "asbestos-containing materials" means "all the material the City says could contain asbestos," even if the City is objectively wrong. This untenable conclusion rests on two bases: the failure-to-notify argument

- 13 -

and the addendum argument. The first is utter nonsense; the second is a dangerous oversimplification.

**II**

I begin with the nonsense. Dore did not submit a pre-bid exception to the estimated quantities of asbestos listed in the Lawhon Report. This failure, according to the majority, has the effect of "binding it to the estimates in the Lawhon Report" as a minimum amount of work. Maj. Op. at 5.

This is a figment of the majority's imagination. The contract never says anything even remotely close to that. Indeed, the clause cited by the majority for this proposition expressly spells out the consequences for a failure to submit a pre-bid exception: "[T]he winning contractor will be held responsible for removal and disposal of all *asbestos containing materials* within the building, identified or not." R. 12-1, Hazmat Specs § 1.3(B), PID 701 (emphasis added). Far from a "fanciful construction of facts," this is what the contract *says*, plain as day.

This is simple enough. If you don't submit an exception, then you must abate all the asbestos present in the building. The fact that the City "identified" it as such is unimportant. So is the fact that the City overlooked it (i.e., accidentally labeling asbestos as harmless chalk). If it turns out to be asbestos, the contractor is on the hook for it. That's what the clause says.

What the clause doesn't say is that a defaulting contractor must *pretend* that harmless chalk is asbestos simply because the City thought it was asbestos during the bidding process. If the scientists say that it is, indeed, harmless chalk, then it falls completely outside the scope of the failure-to-notify clause—and probably outside the asbestos-abatement contract entirely. The majority dismisses this argument by saying that specific clauses in a contract usually trump its general purpose. This is true as a matter of black-letter law, but it is irrelevant to the problem

- 14 -

before us because the "specific" provision does not apply. A modifying clause cannot stand on its own, but attaches to the last antecedent. *See Motorists Mut. Ins. Co. v. Dandy-Jim, Inc.*, 912 N.E.2d 659, 665 (Ohio Ct. App. 2009); BRYAN A. GARNER, THE ELEMENTS OF LEGAL STYLE 45–48 (2d ed. 2002). In this contract, that last antecedent to "identified or not" is "asbestos containing materials." Therefore, if plaster does not actually contain asbestos, it is not a "material" covered by the failure-to-notify clause, and the fact that a party "identified" it as such is inconsequential.

Neither does Dore's interpretation render this provision "meaningless," as the majority appears to think. Maj. Op. 5–6. Construction contracts are often drafted to cover as many factual contingencies as possible—and those provisions do not become meaningless simply because their condition precedent or subsequent does not occur. *Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*, 16 N.E.3d 645, 648–49 (Ohio 2014) (describing the dual outcomes possible when a contract is contingent on facts yet to occur); *Lathrop Co. v. City of Toledo*, 214 N.E.2d 408, 411–12 (Ohio 1966) (holding that promissory words are not nullified by words making them conditional on some event); *see also Hersh v. Kelman*, 104 N.E.2d 35, 36 (Ohio Ct. App. 1951) (stating that parties may, by contract, provide for factual contingencies). The failure-to-notify clause exists solely to protect the City if Lawhon under-estimated the amount of asbestos on the premises and a contractor either (a) tried to avoid removing the newfound asbestos, or (b) removed it without telling the City and then sought more compensation.[1] The Supreme Court

---

[1] The majority claims that this position is erroneous because "it would apparently exist only to require the contractor to file an exception to permit it *not* to abate confirmed asbestos," and even disregarding this anomaly, it would be illegal to exempt asbestos from the contract. This complaint is easily dismissed. First, as demonstrated above, the exception clause exists so that a contractor can preserve its right to get paid for abating asbestos *overlooked* by Lawhon. In other words, if Lawhon did not adequately test an area for asbestos, a contractor should file an exception to put the City on notice that the contractor is contemplating that there is more work to be done than the City thought. The clause has no application in the reverse situation (present here), where the contractor thinks there is *less* work to be done than Lawhon thought. And to the extent that the clause could be used to "illegally" exempt a contractor from abatement, the contract already does that—it says that a contractor need not remove asbestos-

of Ohio has shown no sympathy to contractors in these situations. *See, e.g.*, *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519, 526–28 (Ohio 1997) (holding that these tactics are impermissible because they defeat the government's efforts to engage in responsible fiscal planning).

We have exactly the opposite situation here. Upon starting work, Dore confirmed its initial hunch that there was less asbestos present than initially thought. Prior to the City's demand for more work, Dore never asked for more money, more time, or anything besides the agreed-upon compensation. The City's characterization of this case as a demand for a 71% "markup" in the contract price is merely rhetorical sleight of hand—the only reason Dore filed this lawsuit is because the *City* forced it to abate materials that were not asbestos. The City has no right to blame Dore for an inequity or financial crisis of the City's own creation. *See Greer–Burger v. Temesi*, 879 N.E.2d 174, 184 n.5 (Ohio 2007) (equity will not assist one who comes to court with unclean hands). I therefore fail to see how a requirement that the contractor abate all "asbestos containing materials" requires it to abate things that do not contain asbestos. If contract terms mean the opposite of what they say, why bother with written contracts at all?

But even assuming this (demonstrably false) position—that failing to file a pre-bid exception automatically incorporates the Lawhon Report—the majority's bizarre holding still fails to make any sense. The majority insists that the City "identified" 218,000 square feet of "asbestos containing material" through the Lawhon Report. Therefore, Dore shamefully "disregard[ed] the specifications of the contract" and "undercut the competition" because

---

containing roofing materials. Hazmat Specs, § 1.3. The ultimate legal obligation to remove the asbestos before demolition lies on the owner, not the contractor. If one contractor avoids the obligation by filing an exception, the City must simply find someone else to complete the remainder of the work (as they did here—presumably a separate contractor removed the roofing materials).

everything identified by the Lawhon Report was asbestos.  Not so fast.  The contract documents repeatedly describe the Lawhon Report as an estimate, as a reference, or as advisory.  R 12-1, Hazmat Specs § 1.3(A), PID 701 ("This report is to be used as a reference only."); *id.* § 1.3(C) ("The quantities provided below are only estimations based on the survey report . . . . The City . . . . assume[s] no responsibility for the accuracy of these estimates."); *id.* at 703 ("Quantities are only approximations and should be field verified . . . ."); *id.* § 1.3(H)(1), PID 704 ("Listed quantities and locations are only estimates."); *id.* § 1.3(C)(2), PID 703 ("The following table represents estimated quantities which can be used for EPA and ODH notification purposes only."); *id.*, Lawhon Report § 2.0, 5.0, PID 733, 738–39 ("This report . . . should not be used for bidding or notification purposes.").  How can an estimate be an absolute minimum floor of work under a contract, in the unambiguous sense required by the legal standard here?  And how can the courts punish a contractor for partially disregarding an estimate that it believes to be factually incorrect? Never—at least in the real world.

But I forgot: We're in Wonderland.  Those words obviously mean "specification," "scope of work" and "mandatory."  At least when the City wants them to.  This, of course, is required by Wonderland's rules of interpretation.  According to the Mad Hatter, in an ideal Wonderland, "Nothing would be what it is, because everything would be what it isn't.  And contrary wise, what is, it wouldn't be.  And what it wouldn't be, it would.  You see?"  Indeed, as Humpty Dumpty points out to Alice, words used in Wonderland mean whatever the speaker wants them to mean—never mind the listener.

In the real world, of course, the listener's perception matters.  Even though linguistics is sometimes an imprecise science, there is still a definite universe of the possible (and the impossible) meanings from which the parties choose when they use particular words.  The

meeting of the minds fundamental to contract law depends entirely on the parties ascribing at least similar meanings to the same words. *Minster Farmers Coop. Exch. Co., Inc. v. Meyer*, 884 N.E.2d 1056, 1061 (Ohio 2008) ("A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract."); RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange . . . ."). Going forward, how on earth is any contractor going to know what "asbestos containing materials" means if the owner can turn around once work has started and say that it includes non-asbestos, "just to be safe?" And why would a contractor bind itself to perform such a contract if the City can—as here—secure over a million dollars in free labor simply because it is paranoid?

The majority complains that I read the words "only" and "as determined by the contractor" into the contract's references to "asbestos containing materials." But this is not a quarrel with me; it is a quarrel with Ohio law and the Supreme Court of the United States. It is axiomatic that "the expression of one or more persons or things implies the exclusion of those not expressed." *Mercer v. 3M Precision Optics, Inc.*, 908 N.E.2d 1016, 1018 (Ohio Ct. App. 2009). If a contract calls for the abatement of "asbestos containing materials," the fair, commonsense inference is that *non*-asbestos is excluded from the obligations imposed by the contract. *See id.* (stating that the expression of one thing or things "justifies the inference that items not mentioned were excluded by deliberate choice") (internal quotation marks omitted).

But, the majority protests, the City *said* the disputed plaster contained asbestos! True, but that's not important right now. First of all, the Supreme Court has *ordered* us to accept the plaintiff's version of the facts as true on a motion to dismiss. *E.g.*, *Wood v. Moss*, 134 S. Ct. 2056, 2065 (2014). Dore contends that the plaster did not contain asbestos. By fixating on the

City's resolution of that factual issue, the majority is virtually begging the Justices to summarily reverse this Court for ignoring its holdings, as it has repeatedly done on other issues. The majority can only justify its decision by claiming that, as a matter of law, the plaster contained asbestos. But under Ohio law, the City's declaration that something contains asbestos does not make it so. A purchaser in a satisfaction-based commercial contract does not enjoy unlimited power to dictate what terms mean or to withhold its satisfaction from the other party's performance. *Blair v. McDonagh*, 894 N.E.2d 377, 388 (Ohio Ct. App. 2008); *Hutton v. Monograms Plus, Inc.*, 604 N.E.2d 200, 203–04 (Ohio Ct. App. 1992). And it is abusive, arbitrary, and capricious to declare that something contains asbestos when it does not.

I therefore find it logically impossible to join the majority opinion on this point. The contract required Dore to abate asbestos-containing plaster. Some plaster in the building did not contain asbestos. Dore's failure to object to the advisory Lawhon Report only required it to abate all the asbestos in the building. I cannot comprehend how this unambiguously required Dore to pretend things were asbestos when they are not.

### III

Nonsense aside, I turn to the majority's only remaining argument. Although it is far from nonsensical, it rests on a dangerous oversimplification of the record before us. Before bids were due, the City issued an addendum to the contract which stated: "all of the plaster is confirmed to contain asbestos and is to be removed." The majority argues that this required Dore to abate all the plaster, even if the plaster did not contain asbestos. Perhaps it did. But when this single sentence is placed in the context of the 300-page contract, other equally plausible meanings emerge, rendering this perfunctory command more ambiguous than it appears at first blush. *Cf. King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("[O]ftentimes the meaning—or ambiguity—of

certain words or phrases may only become evident when placed in context.") (internal quotation marks omitted). In Ohio contract cases, choosing between probable meanings is a question for the factfinder, and we lack the authority to answer it by looking at the pleadings. *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins.*, 210 F.3d 672, 684 (6th Cir. 2000) (applying Ohio law). The majority's decision to resolve this issue in the City's favor anyway, despite the legal posture of this litigation and the City's status as the movant, skips this crucial step in the process.

The law is firmly on Dore's side here. We routinely reject attempts by parties and district courts to oversimplify the facts and end cases prematurely, reasoning that factual judgments about intent and contract performance are "more appropriately made after a fair presentation of the evidence . . . rather than during the summary judgment phase of litigation." *Nat'l City Bank v. Syatt Realty Grp.*, 497 F. App'x 465, 470–71 (6th Cir. 2012) (Opinion of Donald, J.) (reversing grant of summary judgment in a breach-of-contract case because a genuine issue of fact remained as to whether the lender performed according to the contract's terms). *See also Krumpelbeck v. Breg, Inc.*, 491 F. App'x 713, 719–20 (6th Cir. 2012) (Opinion of Donald, J.) (reversing grant of summary judgment because district court impermissibly accepted the defendants' interpretation of the medical literature, even though the plaintiff's interpretation was plausible). The majority claims that the contract is so unambiguous that there is no need for any factual hearings on intent. This is a drastic oversimplification of the contract, for three reasons.

First, the majority reads fundamental assumptions out of the text of the addendum. The contract itself demands that "[w]ords implied, but not stated, shall be inferred as the sense requires." R. 12-1, Summary of Work § 1.8(B)(1), PID 652. The addendum provides the contractor with two things: a fact and a command. It states that all the plaster contains asbestos (the fact), and that it must be abated (the command). But the command makes little sense to an

asbestos-abatement contractor if the fact is negated by reality. Thus, it makes perfect sense for a contractor to read this language as presenting a command *contingent* on the truth of the fact: i.e., as saying, "All the plaster is confirmed to contain asbestos and therefore must be removed." To be sure, the parties were certainly entitled to stipulate that all the plaster must be abated, regardless of its asbestos content—and the City has a plausible argument that the addendum is such a stipulation. But this is not the only plausible argument.

Second, the majority conflates plaster *removal* with asbestos *abatement*. It's easy and cheap to *remove* plaster from a building, and Dore is not complaining about that task. But it's labor-intensive, tedious, and expensive to *abate* asbestos—and these are the expenses that Dore is complaining about. The Code of Federal Regulations imposes strict requirements on owners who want to demolish buildings with asbestos content, including meticulous wrapping, bagging, wetting, and ventilation rules that must be followed regarding the asbestos prior to general demolition and removal of non-asbestos material. 40 C.F.R. § 61.145(c). This process is called *abatement* in construction lingo. Only after the asbestos-containing plaster has been successfully "abated" can the rest of the plaster be safely "removed."

Thus, it is reasonable for a contractor to read that plaster "must be removed" and think that the owner is referring to the second step of the process. He is unlikely to speak up, because such an adjustment to his workload is a minor one—or a "clarification,"[2] as this statement

---

[2] The words *clarification* and *specification* mean very different things in a construction contract. The City's decision to label this as a clarification is a strong indicator that it did not intend to "change the contract sum or contract time," or the scope of work, for that matter. THE CONSTRUCTION PROJECT: PHASES, PEOPLE, TERMS, PAPERWORK, PROCESSES, § 1.III.A.2, *ASI (Architect Supplemental Instruction)*; *id.* § 5.III.B.2, *Coordination and Clarification*. At the very least, no one could truly expect the contractor to think this addendum changed the scope of work in the contract—relying, as he must, on the customary meaning of words in his industry. A specification, on the other hand, can (and often does) change the scope of the contract, and should have been used here if the City truly wanted to change the scope of work. *See* BRUNER & O'CONNOR, CONSTRUCTION LAW § 5:27, ¶ 1.1.6, *The Specifications (Definitional)* ("Specifications are defined as 'written requirements for materials, equipment, systems, standards in workmanship' and are part of the contract documents."); *Cedar Bay Constr., Inc. v. City of Fremont*,

described itself. A contractor watching for substantial changes to the scope of the expensive abatement process would ordinarily expect to see that word used in any significant alterations released by the owner. In other words, had the addendum read, "all the plaster is confirmed to contain asbestos and must be abated as such," I would agree that Dore must lose this case on the pleadings. As it stands, however, the City's use of the word "removal" in the asbestos-abatement context is sufficiently confusing that we need extrinsic evidence to explain what was going through the parties' minds.

Third, the majority ignores strikingly similar precedent from the Supreme Court of Ohio. That Court—whose holdings govern the outcome here—has specifically addressed this issue. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519 (Ohio 1997). *Foster Wheeler* was another hazardous materials abatement case, involving the same environmental engineer as this case (Lawhon). *Id.* at 521. *Foster Wheeler* therefore provides invaluable guidance on how the Ohio courts interpret contracts like the one before us. In *Foster Wheeler*, the contractor, after excavation, found more hazardous waste than Lawhon had identified. *Id.* at 522–23. Without obtaining written authorization from the government owner, the contractor removed the extra waste and demanded payment. *Id.* at 523–24. The government refused. *Id.* at 525.

The government relied on a provision in the contract stating that "[n]o alterations shall be made in the work shown or described by the plans and specifications, except upon the written order of the Owner." *Id.* at 527. The contractor responded by arguing that the contract provided a "unit price," which stated that the contractor would be paid a certain sum per unit for quantities "either in excess of or less than the base bid of 140 cubic yards." *Id.* at 522. The contractor

---

552 N.E.2d 202, 204–06 (Ohio 1990) (forbidding parties from adding specifications, but not clarifications, after the bids have been opened but before the contract is signed).

relied on this section (not without reason), saying that the specific always controls the general, and that the language "in excess of . . . the base bid" clearly permitted it to do more work, and be paid for it, without notice or written authorization. *Id.* at 522, 527.

The Supreme Court of Ohio sided with the government. Reading the whole contract, the Court held that the intent of the parties was to provide a flexible per-unit scheme up to the base bid amount (i.e., the unit price *x* 140 cubic yards). *Id.* at 527–28. However, lest the written-approval clause be rendered meaningless, the contractor must seek authorization for work above that amount—even though the attachment seemed to clearly permit payment "in excess of . . . the base bid" and did not mention notice or authorization. *Id.* at 522, 528. The Court reasoned that otherwise, a contractor could transform a limited enterprise into a "runaway project[]" and charge the City for a potentially infinite amount of labor. *Id.* at 528. Using the base bid as a presumptive ceiling made sense in light of the goals of competitive bidding and thus was the best reflection of the parties' intent. As the Court said, "The compensation to be paid was, therefore, based upon a price fixed as a result of competitive bidding, and was not left to [a time] when it might be possible for either to take advantage of the situation of the other." *Id.* at 527.

*Foster Wheeler* controls the outcome here. If *Foster Wheeler* held that a clear, specific provision cannot be interpreted to allow a contractor to charge the owner for an unlimited amount of labor, then the converse must also be true: The City cannot invoke a one-sentence clarification to extract as much free labor as it deems necessary, regardless of what the rest of the contract says. The Addendum here seems clear on its face; but so did the attachment in *Foster Wheeler.* The Ohio Supreme Court acknowledged this, but cautioned subordinate courts (which, in this context, includes ours) that "the point to reading the contract as a whole is to avoid this very kind of abstract interpretation" where one party tries to win based on a footnote. *Id.* at 527

("If the Unit Price Attachment constituted the entire agreement . . . we might find some merit in [the contractor]'s interpretation of the footnote . . . ."). Thus, the majority is wrong when it says that the specific automatically controls the general language of a construction contract—here, to get rid of the asbestos. Maj. Op. at 6. *Foster Wheeler* teaches that this is not always the case.

True, *Foster Wheeler* is distinguishable because the addendum here purports to supersede all things "stated or shown to the contrary" in the contract. R. 12-1, Addendum 01, PID 511. For that reason, we cannot grant Dore's request for judgment on the pleadings, any more than we can grant the City's. But exactly what parts of a 300-page contract are contrary to the addendum? The advisory warnings on the Lawhon Report? The specifications? The change-order provisions and changed-condition rules discussed below? We don't know, because the addendum doesn't say. This is a classic ambiguity that we cannot resolve by looking at the four corners of the agreement. *Davis v. Loopco Industs.*, 609 N.E.2d 144, 145 (Ohio 1993). We therefore cannot grant judgment on the pleadings in favor of the drafter (here, the City) without violating Ohio contract law. *Lathrop Co. v. City of Toledo*, 214 N.E.2d 408, 412 (Ohio 1966) (ambiguities in public-works contracts must be resolved in favor of the contractor).

Oversimplifications are generally harmless. This one is not. We are bound to apply the laws of the state of Ohio, because we lack the authority to change "the voice adopted by the State as its own." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938). Moreover, having two rules of decision—one for state court and one for federal court—encourages forum-shopping and "render[s] impossible equal protection of the law." *Id.* at 74. Today's decision disregards the holistic approach to construction contracts used by the Supreme Court of Ohio, and instead fixates on one sentence of a 300-page document to deny relief when the Ohio courts would almost certainly find enough ambiguity to proceed past the pleadings. Now, there are two

standards to be applied to Ohio construction cases—one for out-of-state contractors suing in diversity, and one for in-state contractors who must sue in the state courts. In federal court, the most specific provision controls, no matter what else the contract might say. In state court, the contract will be viewed as a whole, even if one part seems to clearly favor one party. This is exactly what the Supreme Court has been trying to avoid since *Erie*. Because I think this oversimplification is dangerous to our judicial system, I cannot join the opinion of the court.

## IV

But even in Wonderland, Dore can still maintain a breach-of-contract claim. And that makes the majority's opinion even more troubling, because it doesn't play by its own rules. The majority claims that "there were prescribed methods" for altering the scope of work under the contract (i.e., by submitting a pre-bid exception), and that "Dore failed to employ those mechanisms." Maj. Op. at 1.

False. Submitting an exception during bidding is not the only way the contract permits parties to change the scope of work. The contract expressly contemplates that the site conditions may be different than agreed to in the bid documents, and permits the parties to seek changes— even after the contract is signed. Specifically, Article 7.5 of the General Specifications (*Differing Site Conditions*) contemplates that, after work begins,[3] the contractor might encounter "otherwise concealed physical conditions . . . at the Site that differ materially from the conditions indicated in the Contract Documents." R. 12-1, Gen. Specs, Art. 7.5, PID 548. If this occurs, the contractor must immediately stop work and notify the Owner. *Id.* If the Owner agrees that the change is necessary, it must "process an appropriate Change Order." *Id.* If the Owner disagrees,

---

[3] As opposed to any discrepancies that arise during the bidding process. Article 7.5 assumes the work has already begun at the time the differing condition is identified. *See, e.g.*, *id.* Art. 7.5.2, PID 548.

the contractor may initiate administrative dispute resolution and file a lawsuit to recover for extra costs or to seek extra time to comply. *Id.*; *see also id.*, Art. 8.

Dore invoked these procedures here. Perhaps the parties did agree, through the addendum at the bidding stage, that all the plaster contained asbestos. But, after the contract was signed, Dore (a) discovered that the addendum was factually wrong, (b) notified the City of the error, and (c) proposed appropriate changes, which were blessed by the Ohio EPA. *See* R. 1, Compl. ¶¶ 23–29, PID 4–5. Completely aside from the failure-to-notify and the addendum issues, the General Specifications themselves obligated the City to consider Dore's changes and approve them if they were reasonable. True, the contract required Dore to perform "to the City's satisfaction," Maj. Op. at 7, but Ohio law dictates that a commercial party's dissatisfaction cannot be arbitrary or unreasonable. *Hutton v. Monograms Plus, Inc.*, 604 N.E.2d 200, 203–04 (Ohio Ct. App. 1992). Thus, "the refusal of a public entity to give a contractor a written order for alterations, in accordance with a contract stipulation therefor, may constitute a breach of contract." *Foster Wheeler*, 678 N.E.2d at 528. In other words, a City's unreasonable refusal to alter the scope of work when presented with new facts can constitute a breach of contract, even if the contractor previously agreed to a different scope of work.

The parties, of course, disagree about whether the City's actions were unreasonable. However, unreasonableness is a classic question of fact, and we can only dismiss the case if— assuming Dore's version of the facts are true—the City's refusal to alter the contract was not unreasonable. Dore says it has proof that the plaster at issue did not contain asbestos. R. 1, Compl., ¶¶ 30–31, 36, PID 4–5. And if this is true, then it is arbitrary, capricious, and downright bizarre to force an asbestos contractor to pretend something contains asbestos when it, in fact, does not. Under these facts, Dore certainly had the right to "a written order for alterations, in

accordance with [the] contract stipulation therefor" contained in the General Specifications. *Foster Wheeler*, 678 N.E.2d at 528.

This right should not be confused with Dore's ultimate case on the merits. The City was—and is—entitled to defend against Dore's claims by proving that its demand was justified by the actual site conditions. For example, the City could show that Dore would have been obligated to abate certain non-asbestos in order to safely access the actual asbestos. Or it could prove that Dore's experts were simply wrong about the asbestos content of the site. District courts dispose of summary judgment motions on these grounds every single day, and the Supreme Court has provided us with excellent guidance on that subject. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The majority complains that Dore's reading of the addendum renders it meaningless. Maj. Op. at 5. But the majority's reasoning does the exact same thing to the change-of-work and changed-circumstances provisions of the contract—sections that are far more elaborate, lengthy, and well-thought-out than a one-sentence clarification. It is hard for me to believe that these sections were unambiguously superseded by the addendum. The clarification was related to one stage of the process—the bidding and the specifications. The changed-circumstances provisions, however, are related to a completely different stage: post-bid, mid-stream problems.

Thus, I can see how the addendum might have modified the specifications. I can see how it may have superseded the advisory labels on the Lawhon Report by saying that the plaster is "confirmed" to contain asbestos, rather than "estimated" to contain asbestos. It makes some sense that a pre-bid addendum would alter the substance of the plans on which the contractor was bidding. However, it makes far less sense to say that a pre-bid addendum altered the post-bid processes by which a contractor was entitled to seek changes based on new information. Perhaps

this is what the parties intended at the time. But that is not obvious from the perfunctory nature of the addendum. This ambiguity requires that we deny the motions for judgment on the pleadings and remand for a factual determination of exactly what was contrary to the addendum in the minds of the parties.

## V

There are two ironies in this case. First, the majority concludes its opinion by tritely admonishing Dore that "[t]he contract required Dore to abate all ACM in the building to the City's satisfaction." Maj. Op. at 10. Of course it does—it's an asbestos-abatement contract. Since the beginning of this case, Dore has said that it was more than happy to abate all the asbestos in the building for the agreed-upon price. R. 23, Dore's Resp. to Mot. to Dismiss, PID 967. And Dore has freely acknowledged that it will lose this case if the disputed plaster actually did contain asbestos. *Id.* ("Dore was prepared to . . . accept the liability should there be more ACM in the building than identified in the bid documents."). Dore simply wants us to compel the district court to adhere to the Federal Rules of Civil Procedure, which require that we assume, at this point, that the disputed plaster did not contain asbestos—regardless of what the City thought. If that is true, then nothing in the contract unambiguously required Dore to pretend that it *was* asbestos.

In a second irony, the majority tritely accuses me of inventing a "new rule of contract interpretation" and ignoring "controlling precedent" and "construction jurisprudence." I have no idea what they are talking about. Indeed, in purporting to indict me for the error of my ways, the majority identifies neither the rule I have "invented" nor the precedent or construction practices I am accused of mutilating. Lawyers and judges can see for themselves the disparity between the substantial authority I have cited and the majority's tepid analysis of the relevant law.

No matter. Dore did a better job estimating the asbestos content of City property in a competitive-bidding system and offered the City a good deal—and for that, apparently, Dore must suffer. But this is nonsense from the heart of Wonderland. As Judge Learned Hand instructed us: "The successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Aluminum Co. of America*, 148 F.2d 416, 430 (2d Cir. 1945). Today, the majority does exactly that by reading a contract to say things it, quite frankly, doesn't say, in order to save the City from its own competitive blunder. To future contractors who may find themselves litigating under Ohio construction law in federal court, beware: Anything you sign can and will be used against you, and it may mean exactly the opposite of what it says.

I dissent.